1
2
3
4
5
6

Paul L. Stoller (Bar No. 016773)
Lincoln Combs (Bar No. 025080)
GALLAGHER & KENNEDY, P.A.
2575 East Camelback Road
Phoenix, Arizona  85016-9225
Telephone:  (602) 530-8000
Facsimile:  (602) 530-8500
E-mails:   paul.stoller@gknet.com
                 lincoln.combs@gknet.com

7
8
9
10
11
12

As local counsel on behalf of:

Gale D. Pearson, Esq. (MN #244673)
PEARSON, RANDALL, & SCHUMACHER, P.A.
310 Fourth Avenue South, Suite 5010
Minneapolis, Minnesota 55415
Telephone: (612) 767-7500
Facsimile: (612) 767-7501
Email:gpearson@prslegal.com

13

Attorneys for Plaintiffs

14
15

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZIONA

16
17
18
19
20
21
22
23
24
25
26

| | |
|---|---|
| Monica L. Perez, individually and on the behalf of beneficiaries for the Estate of Francisco C. Perez (deceased),<br><br>Plaintiffs,<br><br>v.<br><br>Medtronic, Inc., Medtronic Neuromodulation, a division of Medtronic, Inc., Medtronic Puerto Rico Operations Co., Medtronic USA, Inc., and Medtronic Logistics, LLC,<br><br>Defendants. | No.<br><br>**COMPLAINT**<br><br>**(Products Liability – Wrongful Death)**<br><br>**AND**<br><br>**DEMAND FOR JURY TRIAL** |

27
28

COMES NOW, Plaintiff Monica L. Perez, individually and on the behalf of

beneficiaries for the Estate of Francisco C. Perez (deceased), by and through his

*Gallagher & Kennedy, P.A.*
*2575 East Camelback Road*
*Phoenix, Arizona  85016-9225*
*(602) 530-8000*

undersigned attorneys, and hereby files this Complaint against the above-named

Defendants, Medtronic, Inc.; Medtronic Neuromodulation, a division of Medtronic, Inc.;

Medtronic Puerto Rico Operations, Inc.; Medtronic USA, Inc., and Medtronic Logistics,

LLC (collectively "Defendants" or "Medtronic"), and states and alleges as follows:

## I.   <u>INTRODUCTION</u>

1.      This is a products liability action seeking damages for personal injuries and wrongful death of Francisco C. Perez arising from his use of a defective product designed, manufactured, labeled, and distributed, or otherwise placed into the stream of commerce by Defendants and/or each of them. As set forth herein, Mr. Perez suffered severe and permanent injuries, hospitalization, and death as a foreseeable, direct and proximate result of defects in his Device, a Medtronic SynchroMed® II Programmable Implantable Infusion Pump System for intrathecal drug delivery, which was implanted in his body. Monica L. Perez, in her capacity individually as surviving spouse and on the behalf of beneficiaries for the Estate of Francisco C. Perez (deceased), brings this action on behalf of Francisco C. Perez (deceased) to recover for the damages caused by Defendants' conduct.

## II.   <u>PARTIES, JURISDICTION, AND VENUE</u>

2.      Plaintiff Monica L. Perez is a citizen of Arizona and resides in Avondale, Arizona. Monica L. Perez is the surviving spouse of Francisco C. Perez, and commences this action on her own behalf as surviving spouse and in her capacity as in her capacity individually as surviving spouse and on the behalf of beneficiaries for the Estate of Francisco C. Perez (deceased).

3.      Francisco C. Perez was an adult citizen of Arizona and he resided with his wife, Monica L. Perez in the City of Avondale, County of Maricopa, State of Arizona. He was pronounced dead on August 28, 2014.

4.      At all times relevant hereto, Defendant Medtronic, Inc., was and is a corporation or other business entity with its principal place of business at 710 Medtronic

Parkway, Minneapolis, Minnesota 55432, and was involved in the design and/or assembly and/or manufacture and/or testing and/or packaging and/or labeling and/or marketing and/or distribution and/or sale and/or promotion and/or was otherwise involved in the placing in the stream of commerce medical devices and a device specifically called the SynchroMed® II Programmable Implantable Infusion Pump System (hereinafter referred to as "SynchroMed® II Device").[1]

5.     At all times relevant hereto, Defendant Medtronic Neuromodulation, a division of Medtronic, Inc., was and is a corporation or other business entity with its principal place of business at 7000 Central Avenue NE, Fridley, Minnesota 55432, and was involved in the design and/or assembly and/or manufacture and/or testing and/or packaging and/or labeling and/or marketing and/or distribution and/or sale and/or promotion and/or was otherwise involved in the placing in the stream of commerce medical devices and the SynchroMed® II Device.

6.     At all times relevant hereto, Defendant Medtronic Puerto Rico Operations Co., was and is a corporation or other business entity and a wholly owned subsidiary of Defendant Medtronic, Inc., with its principal place of business in Ceiba Norte Industrial Park Road 31, Km. 24, HM 4 Call Box 4070, Juncos 00777-4070, Puerto Rico, and was involved in the design and/or assembly and/or manufacture and/or testing and/or packaging and/or labeling and/or marketing and/or distribution and/or sale and/or was otherwise involved in placing in the stream of commerce medical devices and the SynchroMed® II Device.

7.     At all times relevant hereto, Defendant Medtronic USA, Inc., was and is a corporation or other business entity with its principal place of business at 710 Medtronic Parkway, Minneapolis, Minnesota 55432, and was involved in the design and/or assembly and/or manufacture and/or testing and/or packaging and/or labeling and/or marketing

---

[1] The term "SynchroMed® II Device" includes the intrathecal sutureless catheter.

3

and/or distribution and/or sale and/or was otherwise involved in placing in the stream of commerce medical devices and the SynchroMed® II Device.

8.     At all times relevant hereto, Defendant Medtronic Logistics, LLC, was and is a limited liability corporation or other business entity and wholly owned subsidiary of Defendant Medtronic, Inc., with its principal place of business at 710 Medtronic Parkway, Minneapolis, Minnesota 55432, and was involved in the design and/or assembly and/or manufacture and/or testing and/or packaging and/or labeling and/or marketing and/or distribution and/or sale and/or was otherwise involved in placing in the stream of commerce medical devices and the SynchroMed® II Device.

9.     At all times relevant to this action, Defendants were authorized to do business within the States of Arizona and Minnesota, and manufactured, supplied, distributed, formulated, prescribed, marketed, and sold or otherwise placed into the stream of commerce the SynchroMed® II Device within the States of Arizona and Minnesota.

10.     This Court has jurisdiction over this action because of diversity of citizenship under 28 U.S.C. Section 1332.  Plaintiff is a citizen of Arizona and the amount in controversy exceeds the sum or value of seventy-five thousand dollars ($75,000), exclusive of interests and costs.

11.     Venue is proper as a substantial part of the events or omissions giving rise to this action occurred in this judicial district.

### III.     FACTUAL ALLEGATIONS

12.     Francisco C. Perez was a sixty-three (63) year old adult citizen residing in Arizona with his wife, Monica L. Perez. Together they have two (2) children.

13.     Francisco C. Perez suffered serious injuries and death from a malfunctioning and defective SynchroMed® II Device that was designed, tested, manufactured, produced, processed, assembled, inspected, distributed, marketed, labeled, promoted, packaged, advertised for sale, placed in the stream of commerce, and sold or otherwise provided to Mr. Perez by Defendants.

14.    Mr. Perez's injuries proximately resulted from the negligent and/or reckless and/or other wrongful acts and omissions, and fraudulent representations of Defendants and/or each of them, all of which occurred within the jurisdiction of this Court.

15.    Mr. Perez was suffered from disabling chronic low back pain stemming from an injury on March 11, 1983 and failed low back surgeries. At the time of his treatment and death, Mr. Perez was in the care of his wife, Monica L. Perez. In order to reduce pain associated with his condition, Mr. Perez was persuaded to have a SynchroMed® EL Device implanted in his abdomen to administer a combination of medications into the intrathecal space of his spine to reduce or eliminate the need for oral medications to control his pain. When the SynchroMed® EL Device failed, Mr. Perez was persuaded to have a SynchroMed® II Device implanted to replace it.

16.    On January 4, 2010, Mr. Perez had a replacement of a SynchroMed® II Device, comprised of a Model #8637-40 pump (Serial # NGV429498H) and an intrathecal catheter, implanted in his body performed by Dr. F. David Barranco at Banner Thunderbird Medical Center in Glendale, Arizona. He was having a replacement of the Device due to a battery failure of his previous SynchroMed® EL Device. During this surgery, he also had a replacement revision of the distal intrathecal catheter as the catheter had frayed and fractured at the nipple site where it attached to the pump.

17.    The SynchroMed® II Device implanted in his body was intended to deliver a programmed amount of a combination of medications, including Dilaudid, Bupivacaine, and Baclofen into his spine, reducing or eliminating the need for oral medications to control his pain.

18.    Shortly after Mr. Perez had his SynchroMed® II Device implanted, his pain improved somewhat. However, over the years that Mr. Perez had the SynchroMed® II Device, he experienced a series of overdosing episodes and withdrawal with lethargy, decreased responsiveness, increased sedation, nausea, vomiting, diarrhea, weight loss, weakness of limbs, dehydration, chest pain, severe drowsiness, sweating, and other symptoms and injuries. Over the course of the next several years, Mr. Perez's pump

malfunctioned, causing him significant injuries greatly contributing to his increased illness and progressive weakness and frailty, subsequently resulting in his death.

19.     On June 1, 2010, Mr. Perez appeared at his physician's office for his regularly scheduled pump fill.  At that time, his physician expected 2.5 cc of medication to be remaining in his pump, however less than 1 cc medication actually remained, indicating Mr. Perez's pump overinfused approximately 2.4 cc of medication than prescribed by his physician during the course of three months. On September 13, 2010, Mr. Perez again appeared at his physician's office for his regularly scheduled pump fill. At that time, his physician expected 2.5 cc of medication to be remaining in his pump, however less than 1.1 cc medication actually remained, indicating Mr. Perez's pump overinfused approximately 2.3 cc of medication than prescribed by his physician during the course of three months.

20.     For instance, on September 15, 2010, Mr. Perez was nonresponsive and slept for almost two (2) days. He was seen in the emergency room at Banner Estrella Hospital in Phoenix, Arizona, having been brought in by paramedics and hospitalized until September 19, 2010. On November 7, 2010 fell asleep while toileting and fell forward cutting open his head. He suffered a concussion for which he sought emergency treatment at Banner Estrella Hospital.

21.     On December 21, 2010, Mr. Perez again appeared at his physician's office for his regularly scheduled pump fill.  At that time, his physician expected 2.9 cc of medication to be remaining in his pump, however the reservoir at this visit was empty, indicating Mr. Perez's pump overinfused approximately 2.9 cc of medication than prescribed by his physician during the course of three months.

22.     On February 16, 2012 he was seen one again in the emergency room at Banner Estrella Hospital with the same symptoms in addition to diaphoresis (excess sweating), anxiety, and what he described as "skin crawling" with a significant increase in his pain.

23.     On February 28, 2011, Mr. Perez again appeared at his physician's office for his regularly scheduled pump fill.  At that time, his physician expected 2.9 cc of medication to be remaining in his pump, however the reservoir at this visit was empty, indicating Mr. Perez's pump overinfused approximately 2.9 cc of medication than prescribed by his physician during the course of three months.

24.     On April 27, 2011, Mr. Perez again appeared at his physician's office for his regularly scheduled pump fill.  At that time, his physician expected 2.9 cc of medication to be remaining in his pump, however the reservoir at this visit was empty, indicating Mr. Perez's pump overinfused approximately 2.9 cc of medication than prescribed by his physician during the course of three months.

25.     Several fills later, on February 23, 2012 Mr. Perez again appeared at his physician's office for his regularly scheduled pump fill.  At that time, his physician expected 4.2 cc of medication to be remaining in his pump, however less than 0.5 cc medication actually remained, indicating Mr. Perez's pump overinfused approximately 3.7 cc of medication than prescribed by his physician during the course of three months. On February 25, 2012, once more Mr. Perez was nonresponsive and slept for almost two (2) days. He was seen in the emergency room at Banner Estrella Hospital, having been brought in by paramedics and hospitalized until February 28, 2012.

26.     On or about May 15, 2012, Mr. Perez once more experienced withdrawal symptoms of increased pain, crying, agitation, cold sweats, anxiety, shakiness, and itchy skin. His pump was refilled on May 16, 2012 and Mr. Perez's symptoms promptly started to dissipate. However, on June 1, 2012, Mr. Perez exhibited an altered mental state and on June 2, 2012 he experienced a fall, cutting open his head and toe.

27.     On August 8, 2012 Mr. Perez again appeared at his physician's office for his regularly scheduled pump fill.  At that time, his physician expected 5.0 cc of medication to be remaining in his pump, however less than 1.0 cc medication actually remained, indicating Mr. Perez's pump overinfused approximately 4.0 cc of medication than prescribed by his physician during the course of three months.

28. On October 24, 2012 Mr. Perez again appeared at his physician's office for his regularly scheduled pump fill. At that time, his physician expected 5.0 cc of medication to be remaining in his pump, however less than 1.0 cc medication actually remained, indicating Mr. Perez's pump overinfused approximately 4.0 cc of medication than prescribed by his physician during the course of two and a half months.

29. On November 19, 2012 Mr. Perez again appeared at his physician's office for his regularly scheduled pump fill. At that time, his physician expected 5.0 cc of medication to be remaining in his pump, however less than 1.0 cc medication actually remained, indicating Mr. Perez's pump overinfused approximately 4.0 cc of medication than prescribed by his physician during the course of twenty-six days.

30. On December 13, 2012, Mr. Perez underwent a catheter study performed by Dale T. Ratcliffe, D.O. The physician was unable to withdraw from the catheter access port and suspected that there was a catheter malfunction.

31. On January 30, 2013 Mr. Perez again appeared at his physician's office for his regularly scheduled pump fill. At that time, his physician expected 5.0 cc of medication to be remaining in his pump, however less than 1.0 cc medication actually remained, indicating Mr. Perez's pump overinfused approximately 4.0 cc of medication than prescribed by his physician during the course of one month. On January 30, 2013, Mr. Perez had another episode where he was seen at Banner Estrella Hospital for nausea, vomiting, and diarrhea.

32. To follow up on those findings, on February 1, 2013, Mr. Perez then underwent a CT scan that showed a mass at the catheter tip.

33. On May 1, 2013 Mr. Perez again appeared at his physician's office for his regularly scheduled pump fill. At that time, his physician expected 5.0 cc of medication to be remaining in his pump, however less than 1.0 cc medication actually remained, indicating Mr. Perez's pump overinfused approximately 4.0 cc of medication than prescribed by his physician during the course of three months.

34.     On June 19, 2013, Mr. Perez underwent a procedure to replace his catheter with a 66.0 cm Ascenda Intrathecal Catheter Model #8781 performed by Dr. Igor R. Yusopov at John C. Lincoln – North Mountain Hospital in Phoenix, Arizona.

35.     Unfortunately, Mr. Perez then suffered from a cerebral spinal fluid leak (CSF), increased pain, and temporary paralysis of his legs for which he then was then seen at Dr. Yusopov's office the next day. He had his back incision re-sutured to assist in stopping the leak.

36.     Later on Mr. Perez was again seen at Banner Estrella Hospital on August 5, 2012 for extreme pain, numbness of limbs, temporary paralysis. He was given a shot of Dilaudid and his symptoms subsided.

37.     On August 7, 2013 Mr. Perez again appeared at his physician's office for his regularly scheduled pump fill.  At that time, his physician expected 5.9 cc of medication to be remaining in his pump, however less than 1.0 cc medication actually remained, indicating Mr. Perez's pump overinfused approximately 4.9 cc of medication than prescribed by his physician during the course of two months. Medtronic was notified of the discrepancy in medication.

38.     Mr. Perez returned to Banner Estrella Hospital on August 16, 2013 exhibiting weakness, numbness of limbs, chest pain, cold sweats, and increased pain.

39.     He later presented to Banner Boswell Hospital exhibiting similar symptoms of weakness, numbness of limbs, chest pain, and increased pain on December 20, 2013. On December 20, 2013 Mr. Perez again appeared at his physician's office for his regularly scheduled pump fill.  At that time, his physician expected 3.4 cc of medication to be remaining in his pump, however less than 0.5 cc medication actually remained, indicating Mr. Perez's pump overinfused approximately 3.350 cc of medication than prescribed by his physician during the course of two and a half months. Medtronic was notified of the discrepancy in medication.

40.     On February 19, 2014 Mr. Perez again appeared at his physician's office for his regularly scheduled pump fill.  At that time, his physician expected 7.1 cc of

9

medication to be remaining in his pump, however less than 0.5 cc medication actually remained, indicating Mr. Perez's pump overinfused approximately 7.05 cc of medication than prescribed by his physician during the course of three months.  Medtronic was notified of the discrepancy.

41.     Banner Boswell Hospital also treated Mr. Perez for a bowel impaction on March 22, 2014 to March 25, 2014 due to opioid overdose.

42.     On July 22, 2014, Mr. Perez had his SynchroMed® II Device refilled at Desert Pain and Rehab Specialists in Phoenix, Arizona under the care of Dale T. Ratcliffe, D.O. The physician noted that there was 4.9 milliliters less than expected of medication in the pump reservoir as a discrepancy. There was no change in the dosage of medications to be delivered through the SynchroMed® II Device.

43.     On August 21, 2014, Mr. Perez had a refill of his SynchroMed® II Device under the care of Dr. Ratcliffe. Again, the physician noted the discrepancy of medication that should have been in the reservoir of the pump, which should have been 5 milliliters; however, less than 0.1 milliliters was withdrawn. Medtronic was informed of the discrepancy. There was no change in the dosage of medications to be delivered through the SynchroMed® II Device.

44.     On August 22, 2014, Mr. Perez became lethargic and without appetite. He laid down in the early evening and was unconscious and unresponsive thereafter. From August 23 until his death, Mr. Perez exhibited signs that he was in a lot of pain, shallow breathing, and at times had high blood pressure. He was treated by hospice care with medications for comfort care, but never regained consciousness. He was pronounced dead on August 28, 2014.

45.     An autopsy of Mr. Perez performed on September 4, 2014 by the Maricopa County medical examiner indicated that approximately 2 centimeters away from the pump, the SynchroMed® II Device catheter appears to be frayed. There was slightly over 34 milliliters of medication removed from the pump reservoir, which the interrogation of the pump indicated that there should have been 34.8 milliliters. After Mr. Perez's August

21, 2014 refill of his pump to capacity (expected 40 milliliters), on the date of his death on August 28, the reservoir still should have contained 37 milliliters of medication. Again, Mr. Perez had a discrepancy in the medication delivery.

46.     A Medtronic representative interrogated the pump and took possession of it for examination by Medtronic. Upon examination, in its report Medtronic indicated that it found that Mr. Perez's pump was infusing above specifications.

47.     The cause of death from an additional autopsy performed September 6, 2014 has pathological diagnoses as Opiate toxicity due to opiate overdose due to intrathecal pump failure. The blood concentration of Hydromorphone (brand name Dilaudid) found in Mr. Perez's system at his death was a lethal level of opiates with a concentration of 20,969 ng/ML from a toxicology analysis.

48.     The September 6, 2014 autopsy also found that one end of the catheter was faintly jagged. There was also a larger caliber intrathecal catheter that was not attached to the pump that was moving freely in the subdural space of the spinal canal. That catheter also had a semi jagged end on one side and the other end was only slightly jagged.

49.     Starting in 2010, the efficacy of the SynchroMed® II Device in Mr. Perez decreased due to the overdosing of medication delivery to the treatment site then followed by withdrawal symptoms and the return and exacerbation of his pain. The malfunctioning Device delivery of medications to the treatment site caused significant injury and subsequent death.

50.     Though not recognized as such, these symptoms indicated his SynchroMed® II Device was malfunctioning by overdosing the amount of medications delivered to Mr. Perez. Medtronic had not yet announced its recall of Mr. Perez's device due to overinfusion. For the next several years, Mr. Perez suffered greatly from the undiagnosed cycle of overinfusion of medications, followed by increased irritation, discomfort, and pain caused by overinfusions and then withdrawals.

51.     Despite Medtronic's knowledge of its 2014 recall due to the pump's overinfusion and underinfusion of medications despite proper dose programming by the

physician, no one informed the physician and Mr. Perez that the overinfusion and underinfusion cycle causing so much pain and suffering, and subsequently death of Mr. Perez was caused by a defect in a recalled SynchroMed® II Device.

52.    During the time that Mr. Perez was experiencing his symptoms and showing the discrepancy of medications in his pump reservoir, Medtronic was called by Mr. Perez's medical providers. In fact, Medtronic advised Mr. Perez and his medical providers several times that the levels of missing medications were within normal limits of variation.

53.    The SynchroMed® II infusion system implanted in Mr. Perez starting on January 4, 2010 and revised on June 19, 2013 was subject to FDA recalls. The first recall occurred just after his device was implanted in July 2011 due to premature battery depletion.[2], [3] In another recall was dated May 2013 as it was revealed that the pump and Mr. Perez's original catheter do not properly connect to each other resulting in misalignment, fracture, and occluded catheters, preventing delivery of medications into the intrathecal space.[4] In May 2013, all catheters of the model used by Mr. Perez were removed from the market.

54.    Another recall was announced by Medtronic in March 2014 related to a problem with Mr. Perez's Device that resulted in overinfusion associated with the pump. Medtronic wrote: "Overinfusion can result in a life-threatening overdose and can also result in drug withdrawal due to premature emptying of the pump."[5]

55.    Medtronic also issued yet another recall with an "Urgent: Medical Device Removal" for the Ascenda™ intrathecal catheter implanted in Mr. Perez during his catheter revision surgery. Medtronic's urgent notice states that Medtronic was "investigating the possibility of unintentional disconnection of the catheter from the

[2] *See* Ex. 1, Urgent Medical Correction: Premature Battery Depletion.
[3] *See* Ex. 2, Serial Number query for Recall.
[4] *See* Ex. 3, Urgent Medical Correction: SC Catheter.
[5] *See* Ex. 4, Urgent Medical Correction: Overinfusion.

12

pump" which "Medtronic recommends that patients implanted with affected catheters identified in this recall be monitored for symptoms associated with drug withdrawal."[6]

56.    The continuous malfunctions and defects in Mr. Perez's SynchroMed® II Device resulted in severe pain, lack of mobility, severe withdrawals, and ultimately his death. The continuous malfunctions and defects in Mr. Perez's SynchroMed® II Device rendered the Device inefficacious and led to Mr. Perez not receiving the appropriate programmed dose of his medications.

57.    As a result of the aforementioned defects and malfunctions, Francisco C. Perez's defective SynchroMed® II Device failed to deliver the prescribed medications as programmed. These defects and malfunctions resulted in the intermittent delivery of the medication, medication overdosing or "dumps" delivering too much medication to cause his lethargy, or a complete failure to deliver medication, causing withdrawal and severe damages and injury to Mr. Perez and ultimately his death.

58.    Throughout the history of the manufacture of the SynchroMed® II Device, the U.S. Food & Drug Administration (FDA) has repeatedly notified Medtronic that their manufacture of the SynchroMed® II Device failed to conform to manufacturing requirements enumerated in federal regulations and statutes. These federal violations caused the defects and malfunctions in Francisco C. Perez's SynchroMed® II Device, which caused his injuries and damages alleged herein and ultimately his death.

59.    Throughout the history of the manufacture of the SynchroMed® II Device, Medtronic has shown an indifference to federal manufacturing requirements. Further, Medtronic, with full knowledge that they were manufacturing the SynchroMed® II Device in violation of law, nonetheless demonstrated a pattern of delayed responses or complete failures to respond to reported and known safety issues with the SynchroMed® II Device.

60.    Because of Medtronic's years-long pattern of indifference to regulatory authority, noncompliance with federal manufacturing requirements, and violations of

---

[6] *See* Ex. 5, Urgent Medical Device Removal: Ascenda Intrathecal Catheters.

federal law, the U.S. Department of Justice and the U.S. Department of Health and Human Services on April 27, 2015 filed a Complaint against Medtronic requesting a Consent Decree for Permanent Injunction against the manufacture, distribution, and sale of the SynchroMed® II Device.

61.    As a foreseeable, direct and proximate result of Medtronic's conduct described herein, Francisco C. Perez suffered and died. His wife and family suffered loss and incurred further damages of medical bills in amounts to be proven at trial.

A.    **Violations of Federal law in the manufacture of Francisco C. Perez's Device**

1.    **Omitted manufacturing steps caused overinfusion, device failure, and death**

62.    In 2007, 2009, and 2012, including during the time Mr. Perez's SynchroMed® II Device was being manufactured by Medtronic, the FDA performed numerous inspections at the SynchroMed® II manufacturing plant and cited Medtronic for manufacturing the SynchroMed® II Devices in violation of Federal law. In particular, the violations included leaving out required steps in the manufacturing process of the device, necessary to ensure the device can accurately calculate drug reservoir levels and accurately calculate drug dispensing rates. The omitted steps were necessary to prevent the pump from overinfusing and/or underinfusing medication into a patient.[7]

63.    Further, during the time Mr. Perez's SynchroMed® II Device was manufactured, the FDA discovered that Medtronic knew, based upon its own internal investigations and audits of its manufacturing practices, that its SynchroMed® II Devices did not comply with its own manufacturing specifications designed to ensure a device did not overinfuse or underinfuse medication into a patient and that leaving out the necessary steps caused the device to malfunction, causing harm to consumers, including Mr. Perez, who used the defective device.

---

[7] *See* Ex. 6, June 1, 2009 FDA Warning Letter.

64.     In addition to omitting the necessary steps to prevent the pump from overinfusing and underinfusing medication to a patient, the FDA determined that Medtronic, regardless of the seriousness of the harm to the patient, failed to conduct any type of investigation of complaints from the field related to inaccurate drug reservoir levels and inaccurate dispensing rates, including reported field complaints of overinfusion and underinfusion of the medication.

65.     In its Warning Letters specifically addressing missing steps related to inaccurate drug reservoir levels and inaccurate dispensing rates, the FDA wrote that Medtronic violated 21 C.F.R. § 820.100(a) by its "[f]ailure to establish and maintain procedures for implementing corrective and preventative action that include identifying the actions necessary and mandated by federal law to correct and prevent recurrence of nonconforming product and other quality problems, as required by 21 CFR 820.100(a)".[8]

66.     By way of specific example, the FDA stated that manufacturing practices for the SynchroMed® II Devices, failed Medtronic's internal audit which looked at whether all steps necessary to accurately program the device was being performed completely and correctly during the manufacturing process.

67.     The FDA Warning Letter read, "[o]n October 5, 2008, your firm performed a (b)(4) [redacted] of date from the (b)(4) records (which stores the results of in-processing testing) and the (b)(4) manufacturing records (**which controls the manufacturing process for the SynchroMed II Pump**)."[9]

68.     The purpose of the programming at this step required in the PMA specifications of the device, was to ensure devices contained the correct amount of medication as indicated by the reservoir, and that once the physician programed the dispensing rate on the pump, the pump would correctly and consistently deliver the amount of drug programed by the physician. The internal audit discovered this step was

---

[8] *Id.*
[9] *Id.*

not performed. The FDA discovered that Medtronic skipped this PMA required manufacturing step for every single device.

69.     The FDA wrote, "[t]he intent of the (b)(4) was to provide another level of oversight to ensure that in-process tests were actually being performed on devices, as they progressed through manufacturing. This report, however revealed that another step (b)(4) **for each SynchroMed II pump was not performed during manufacturing**."[10]

70.     The FDA explained how the failure to perform this step affected devices such as the SynchroMed® II Device implanted in Mr. Perez. "(b)(4) [redacted] are unique to each device and have values that vary from (b)(4). This constant is used by the device in *critical internal functions such as calculating drug reservoir levels and drug dispensing rates.*"[11]

71.     The FDA further criticized Medtronic's manufacture of the SynchroMed® II Device, and in addition to finding that it failed to comply with the manufacturing specifications of its PMA, it found that it failed to conform with post-manufacturing regulations imposed by mandatory safety requirements under the CGMPs, and its reporting obligations under the Medical Device Reporting requirements (MDR), both of which are mandatory obligations imposed on Medtronic as part of its PMA requirements for the SynchroMed® II Device.

72.     The FDA Warning Letter wrote, "[o]ur investigators found over (b)(4) [redacted] Complaints in your firms' Complaint handling system related to accuracy rates. The (b)(4) [redacted] report did not reference any NCR [Nonconformance Report] or other type of investigation into this problem."[12]

73.     Medtronic was aware that its non-conforming manufacturer of its SynchroMed® II Device caused the devices to be defective. Eventually, in March 2014 Medtronic issued a Class I Recall of the device due to pump overinfusion problems. The Urgent: Medical Device Correction announced, "[a]n upward shift in reports of

---

[10] *Id.*

[11] *Id.*

[12] *Id.*

occurrence for overinfusion. The company defines overinfusion as an infusion rate exceeding the programmed infusion rate by more than 14.5% as described in the labeling. . .When overinfusion occurs, it will result in a volume discrepancy at pump refill where the volume withdrawn from the pump is less than the volume expected. Based on reports, the onset of overinfusion has occurred as early as five months after implant and throughout the service life of the pump. Reports received indicate that once a pump has started to over infuse, infusion rates can continue to increase, in some cases abruptly."[13]

74.    The adverse event associated with overinfusion as described in the Class I Recall is identical to the adverse events experienced by Mr. Perez. "Adverse events associated with overinfusion . . .may include confusion or altered mental state, sleepiness, nausea, respiratory depression and coma, with the risk of death. Overinfusion may lead to emptying of the pump prior to a planned refill and therefore may present clinically as an interruption of therapy including lack of therapeutic effect and withdrawal syndrome. . . . The device does not measure actual reservoir volume and in the context of overinfusion the reservoir may empty entirely without activating an alarm. . . . Reducing the dose and/or concentration will not correct overinfusion because infusion rates may increase over time.'"[14]

75.    Medtronic knew at all material times before Mr. Perez was implanted with a SynchroMed® II Device, that the company failed to have a Quality Control System in place that ensured the delivery rate of the pump operated as programmed.

76.    Medtronic knew at all material times before Mr. Perez was implanted with a SynchroMed® II Device, that based upon its own internal audits and complaints from the field, that the SynchroMed® II Device implanted in Mr. Perez was manufactured without necessary steps designed to prevent overinfusion and underinfusion and ensure an accurate delivery rate of his medications.

---

[13] *See* Ex. 4, Urgent Medical Correction: Overinfusion.
[14] *Id*.

77.     Medtronic knew at all material times that it failed to properly inform the FDA of reported field problems with adequately controlled delivery rates. Had Plaintiff and Plaintiff's medical providers known the SynchroMed® II Device were not manufactured according to PMA specifications, and that the nonconforming products could result in the overinfusion and underinfusion of medications that caused significant suffering in Mr. Perez and resulted in his death, Plaintiff would have avoided use of the defective device as a means to deliver his needed medications.

78.     Medtronic knew at all material times that when it omitted a step in the manufacturing process of each SynchroMed® II Device that ensured accurate pump delivery rate, preventing overinfusion of medication to consumers, it manufactured the devices in violation of its own specifications and PMA requirements, and thereby placed into the market nonconforming, defective goods, in violation of federal law. Further that the violative manufacturing process resulted in a defect as reflected in its Class I Recall of the SynchroMed® II Device due to overinfusion that harmed consumers, including Mr. Perez.

## 2.     Failure to comply with Medical Device Reporting Requirements for catheter

79.     Medtronic, in their manufacture of the SynchroMed® II Device, violated federal law governing manufacture and quality control of PMA medical devices, which was discovered during a series of inspections by the FDA at Medtronic's catheter manufacturing and quality control plants in Minneapolis, Minnesota and Puerto Rico.

80.     The inspections were followed by a series of Warning Letters to Medtronic that identify federal manufacturing and quality control violations at the plants that ultimately led to an April 27, 2015 Complaint Requesting a Permanent Injunction filed against Medtronic by the U.S. Department of Justice and U.S. Department of Health and Human Services, and a Court-Ordered Consent Decree imposing a moratorium on the

manufacture, sale, and distribution of the SynchroMed® II Device in violation of federal law.[15]

81.     The Warning Letters, agency action, and Court Order, which include specific references to the intrathecal catheters, speak to the seriousness of Defendants' violations of federal law and general negligence in the manufacture of the SynchroMed® II Device.

82.     In a 2006 Warning Letter, after an inspection of Medtronic's manufacturing plant located at 800 53rd Avenue NE, Minneapolis, Minnesota, the FDA identified "Significant Deviations" from CGMPs committed by Medtronic while manufacturing its catheters, including the failed intrathecal catheters implanted in Francisco C. Perez's body. The FDA found that, given these "significant deviations" the catheters manufactured, marketed, sold, and used in the SynchroMed® II Device were **"adulterated"** devices. These "significant deviations" include, but are not limited to, the following:

a.     Failure to implement procedures to ensure that a device's design input requirements are appropriate and address its intended use, including user/patient needs (21 C.F.R. § 820.30(c)) in that design input work for intrathecal catheter

b.     Failure to control production processes to ensure that a device conforms to its specification. (21 C.F.R. § 820.70(a));

c.     Failure to implement corrective and preventive action procedures addressing the investigation of the cause of nonconformities. (21 C.F.R. § 820.100(a)(2));

d.     Failure to implement changes in methods and procedures needed to correct and prevent identified quality problems. (21 C.F.R. § 820.100(a)(5));

e.     Failure to identify all of the actions needed to correct and prevent the recurrence of nonconforming product and other quality problems. (21 C.F.R. § 820.100(a)(3)); and

---

[15] *See* Ex. 7, Complaint for Permanent Injunction.

f.    Failure to implement procedures to ensure that device history records for each batch, or unit are maintained to demonstrate that the device is manufactured in accordance with regulations. (21 C.F.R. § 820.184).

The FDA Warning Letter continued: "*The specific violations noted in this letter and the Form FDA-483 . . . may be symptomatic of serious underlying problems in your firm's manufacturing quality assurance systems.*"[16] [17]

83.    The FDA inspected the same Minneapolis Medtronic facility less than a year later, and on July 3, 2007 issued *another* Warning Letter concerning the SynchroMed® II Device. The FDA again warned Medtronic that their devices manufactured at the Minneapolis facility were **"*adulterated*"** and **"*misbranded.*"** A partial list of the violations the FDA found during the 2007 inspection includes:

a.    Medtronic failed to implement complaint handling procedures to ensure that all complaints are evaluated to determine whether the complaint represents an event that must be filed as a Medical Device Report (MDR).

b.    Medtronic failed to submit MDR reports within thirty (30) days of receiving or otherwise becoming aware of information that reasonably suggests that a marketed device may have caused or contributed to a death or serious injury (21 C.F.R. § 803.50(a)(1)). Specifically, Medtronic:

i.    Failed to report SynchroMed® II Device's intrathecal catheters associated with granuloma or inflammatory masses at or near the distal tip, which the FDA considers "serious injuries";

ii.    Failed to report SynchroMed® II Device's intrathecal catheter fractures;

iii.    Failed to report a malfunction MDR, required when a marketed device malfunction would likely cause or contribute to a reportable death or serious injury;

---

[16] *See* Ex. 8, August 29, 2006 FDA Warning Letter and Ex. 9, Form FDA 483, dated January 24, 2007.

iv.     Failed to submit MDR reports within thirty (30) days of learning of a problem (pump malfunctions, catheter fracture or separation, inflammatory masses and granulomas) of Medtronic's device in the literature;

v.     Failed to report consumer self-reported adverse events. (21 C.F.R. § 803.50); and

vi.     Failed to report to the FDA a correction or removal conducted to reduce a risk to health posed by a device. (21 C.F.R. § 806.2(d), 10(a)(1)).

84.     In the July 3, 2007 letter, the FDA warned Medtronic "[y]our firm has several procedures for Medical Device Reporting and Adverse Drug Experience Reporting. These procedures, in turn reference several other procedures. Your firm's current problems regarding MDR reporting, as discussed above in this Warning letter, may be exacerbated by the complexity of your procedures and might have contributed to your firm's deviations from the regulations regarding MDR reporting."[18]

85.     The FDA inspection also revealed several ongoing violations at Medtronic's Minneapolis Plant's Quality System that were noted in a Form 483, stating "[t]he specific violations noted in this letter and Form FDA 483 may be symptomatic of serious underlying problems in your firm's manufacturing and Quality Assurance systems." Specifically, the FDA warned that Medtronic:

a.     Failed to achieve consistent compliance in areas such as design controls. (21 C.F.R. § 820.30); and

b.     Failed to achieve consistent compliance in Corrective and Preventative Action (CAPA). (21 C.F.R. § 820.100).[19]

86.     In February 2011, Medtronic detected a signal showing a problem with catheter occlusion in the SynchroMed® II Device, but Medtronic failed to update a Health

---

[18] *See* Ex. 10, July 3, 2007 FDA Warning Letter.
[19] *Id.*

Hazard Assessment for this defect since 2008, with over three hundred (300) complaints occurring since that time.[20]

87.     Specifically, the FDA notified Medtronic that "regulatory approval was received for Supplement 136 to PMA P860004 on December 15, 2011 to change the designs of the SC Catheter models 8709 SC, . . .to mitigate a known field issue associated with CAPA 1507-SC Catheter Occlusion. This design change was implemented via ECO 12-00985, date March 6, 2012, and the new revision of Catheter models were release to the field on September 2012. *However, the previous SC catheter models which do not conform to the current design have continued to be distributed and have been attributed to 60 complaints of catheter occlusion since September 2012.*" [21]

88.     At all times material Medtronic knew that its catheters were failing at a significantly high rate in the field, but as cited by the FDA in their Warning Letters, failed to investigate failure trends, failed to investigate root causes of the failures, failed to inspect and investigate nonconforming products, failed to timely withdraw nonconforming product from the market, as required under the CGMPs and MDRs which are incorporated as part of the requirements of the SynchroMed® II Devices' PMA approval.

89.     At all times material, Medtronic knew its catheters sold and implanted in Mr. Perez were "adulterated" and "misbranded", and eventually were all recalled due to its high failure rate.

90.     At all times material, Medtronic knew its catheters, including the catheter implanted in Mr. Perez were likely to crack, fray, become occluded, or otherwise break and fail to properly deliver necessary medications to Mr. Perez's treatment site.

**B.     The SynchroMed® II Device**

91.     The SynchroMed® II Device is a programmable drug infusion system implanted in the body for drug delivery. The SynchroMed® II Device includes an infusion pump connected to a thin, flexible catheter attached to the intrathecal space

---

[20] *See* Ex. 11, Form FDA 483, Inspection Observations, dated February 14, 2013 – April 3, 2013.
[21] *Id*.

(spinal canal) of the patient, into which the Device delivers medication. The relevant SynchroMed® II Device was used to administer medications to Francisco C. Perez.

92.     The SynchroMed® II Device is a Class III medical device, approved by the FDA through the Pre-Market Approval (PMA) process in 1988. Since the initial approval under PMA 860004, Medtronic sought FDA approval of at least one hundred ninety-one (191) supplements or changes to the originally-approved Device.

93.     The pump of the SynchroMed® II Device is supplied in twenty (20) and forty (40) ml reservoir sizes, Models #8637-20 and 8637-40 respectively, and the Device is approved solely for the following uses:

a.     The chronic epidural/intrathecal infusion of Infumorph (preservative-free morphine sulfate sterile solution) and Prialt® (preservative-free ziconotide sterile solution) for the management of pain;

b.     The chronic intrathecal infusion of Baclofen (Lioresal) for the management of severe spasticity; and

c.     The chronic intravascular infusion of floxuridine (FDUR) and methotrexate for the treatment of primary or metastatic cancer.

94.     The entire SynchroMed® II Device is implanted and remains under the skin. A clinician measures a precise amount of medication and injects the medication into the pump's reservoir fill port. The medication passes through a reservoir valve and into the pump reservoir. At normal body temperatures, pressurized gas, used as a propellant, is stored below the reservoir and it expands and exerts constant pressure on the reservoir. This pressure pushes the medication into the pump tubing. The battery-powered electronics and motor gears deliver a programmed dose of medication through the tubing out through a catheter port and into a catheter. Medication delivery then continues through the catheter tubing and into the intrathecal space of a patient.

95.     The intrathecal catheters and sutureless revision kits of the SynchroMed® II Device are designed to connect the pump with the patient's intrathecal space. Each

catheter has a pre-attached strain relief sleeve, a connector pin, and a sutureless pump connector that connects to the SynchroMed® II pump.

96. In their marketing, Medtronic represented the SynchroMed® II Device as "safe effective, reliable medical devices; implanted by safe and effective, minimally invasive surgical techniques for the treatment of medical conditions, including the controlled release of Morphine for the treatment of patients suffering from chronic and severe pain."

97. Medtronic marketed the SynchroMed® II Device directly to patients through conversations with Medtronic employees, patient testimonials, and colorful brochures with images of individuals smiling and pain medication patients riding motorcycles. Medtronic's representations to patients include:

a. "a safer way to receive pain medication";

b. "help you rejoin life so you can get back to the activities and people that make you happiest";

c. "allows you to 'Tame your Pain' ";

d. "reduce your need for oral pain medications";

e. "provide peace of mind knowing that you've selected a drug delivery system that was manufactured by Medtronic . . ."

f. "give reassurance because only Medtronic offers a programmable drug delivery system that is FDA approved for MRI scans . . .";

g. "increase your confidence when you consider that more than 150,000 people worldwide have used Medtronic drug delivery therapy to manage their chronic pain";

h. "drug delivery therapy from Medtronic is a *proven safe and effective therapy*";

i. "Medtronic drug delivery therapy has been tested, is shipped sterile, and is FDA approved"; and

j. "more doctors trust Medtronic than any other company offering drug delivery therapy."

24

### C.      FDA Pre-Market Approval (PMA) of the SynchroMed® II Device

98.      Premarket approval (PMA) is the FDA process of scientific and regulatory review to evaluate the safety and effectiveness of Class III medical devices. Class III medical devices are those that 1) support or sustain human life, 2) are of substantial importance in preventing impairment of human health, or 3) which present a potential, unreasonable risk of illness or injury. Due to the level of risk associated with Class III devices, these devices require a premarket approval (PMA) application under Section 515 of the Federal Food Drug and Cosmetic Act (FD&C Act) before they can be sold in the United States. As mentioned, the SynchroMed® II Device is a Class III medical device.

99.      In a PMA application, the applicant is required to supply information to the FDA. The information required includes: a) device description, b) clinical safety trials, c) methods of its product testing, d) design of the device and specific manufacturing controls, e) outcome evaluation, and f) proposed labeling. The FDA does not conduct independent testing on a medical device in a PMA application. The FDA reviews the documentation provided to them by the PMA applicant and relies on the veracity of the company. The PMA applicant (in this circumstance, Medtronic) is solely responsible for submitting all truthful and necessary documentation to the FDA.

100.     Once an application for PMA is approved, the holder (Medtronic) must comply with any and all post approval requirements established by the FDA and federal regulations. The legal requirements include but are not limited to: post marketing monitoring, evaluating and reporting adverse events, and compliance with Current Good Manufacturing Practices (CGMPs). Regulations prohibit the PMA holder from selling an adulterated or misbranded product, and prohibit promoting a device for unapproved uses.

101.     In particular, federal regulations require a PMA applicant such as Medtronic to comply with the following requirements:

**a.      Review, evaluate, and report to the FDA, adverse events associated with the medical device.**

1           i.       Report individual adverse events within thirty (30) days after

2 becoming aware of an adverse event or aware of a reportable death, serious injury or

3 malfunction (21 C.F.R. § 803.10(c)(1)), and

4           ii.      Report individual adverse events no later than five (5) work days

5 after becoming aware of "a reportable event that requires remedial action to prevent an

6 unreasonable risk of substantial harm to the public health . . ." (21 C.F.R. §

7 803.10(c)(2)(i)).

8       **b.**     **Quality System.** Establish and maintain a quality system that is appropriate

9 for the specific medical devices designed or manufactured and that meets the requirement

10 of this part. (21 C.F.R. § 820.5).

11       **c.**     **Management Responsibility.** Management with executive responsibility

12 shall establish its policy and objectives for, and commitment to quality. (21 C.F.R. §

13 820.20).

14       **d.**     **Qualified Personnel.** Have sufficient personnel with the necessary

15 educational background, training, and experience to assure that all activities required by

16 this part are correctly performed. (21 C.F.R. § 820.25).

17       **e.**     **Corrective and Preventative Action** (**CAPA**)**.** Establish and maintain

18 procedures for implementing corrective and preventive action, and document all activities

19 under this section. (21 C.F.R. § 820.100).

20       **f.**     **Complaint Files.** Maintain complaint files, processed in a uniform and

21 timely manner, oral complaints must be documents and must be evaluated to determine

22 whether the complaint represents a reportable event under Medical Device Reporting. (21

23 C.F.R. § 820.198).

24       **g.**     **Statistical Techniques.** Establish and maintain procedures for identifying

25 valid statistical techniques required for establishing controlling and verifying the

26 acceptability of process capability and product characteristics. (21 C.F.R.§ 820.250).

27

28

**h.     Misbranded Drugs and Devices Prohibited.** A device shall be deemed to be *"misbranded"* if its label is false or misleading in any particular. (21 C.F.R. § 820, *et al.*).

**i.     Adulterated Products Prohibited.** If the manufacturer fails to ensure that the methods used in, or the facilities or controls used for, their manufacture, packing, storage, or installation are not in conformity with applicable requirements, including but not limited to the Current Good Manufacturing Practice (CGMP) requirement of the Quality System regulations found at Title 21 Code of Federal Regulations Section 820, then such products are considered **"*adulterated*."** (21 U.S.C. § 351 (h) (emphasis added).

**j.     Prohibition of Off-Label Promotion.** A product may not be manufactured packaged, stored, labeled, distributed, advertised, or promoted in a manner that is inconsistent with any conditions to approval specified in the PMA approval order for the device. (21 C.F.R. § 814.80).

**D.     Violations of federal law resulting in Francisco C. Perez's defective and malfunctioning catheter**

102.    Medtronic, in their manufacture of the SynchroMed® II Device, violated federal law governing manufacture and quality control of PMA medical devices, which was discovered during a series of inspections by the FDA at Medtronic's catheter manufacturing and quality control plants in Minneapolis, Minnesota and Puerto Rico.

103.    The inspections were followed by a series of Warning Letters to Medtronic that identify federal manufacturing and quality control violations at the plants that ultimately led to an April 27, 2015 Complaint Requesting a Permanent Injunction filed against Medtronic by the U.S. Department of Justice and U.S. Department of Health and Human Services, and a Court-Ordered Consent Decree imposing a moratorium on the manufacture, sale, and distribution of the SynchroMed® II Device in violation of federal law.[22]

---

[22] *See* Ex. 7, Complaint for Permanent Injunction.

104.   The Warning Letters, agency action, and Court Order, which include specific references to the intrathecal catheters, speak to the seriousness of Defendants' violations of federal law and general negligence in the manufacture of the SynchroMed® II Device.

105.   In a 2006 Warning Letter, after an inspection of Medtronic's manufacturing plant located at 800 53rd Avenue NE, Minneapolis, Minnesota, the FDA identified "Significant Deviations" from CGMPs committed by Medtronic while manufacturing their catheters, including the failed intrathecal catheters implanted in Francisco C. Perez's body. The FDA found that, given these "significant deviations," the catheters manufactured, marketed, sold, and used in the SynchroMed® II Device were **"adulterated"** devices. These "significant deviations" include, but are not limited to, the following:

a.   Failure to implement procedures to ensure that a device's design input requirements are appropriate and address its intended use, including user/patient needs (21 C.F.R. § 820.30(c)) in that design input work for intrathecal catheter Model #8731 has not resulted in development of a complete design specification for the Platinum Iridium (Pt/Ir) catheter tip bond;

b.   Failure to conduct design validation using production units or their equivalents in that design validation testing of the intrathecal catheter Model #8731 was conducted with catheters manufactured with a Pt/Ir tip marker bonding process that was different than used in production. (21 C.F.R. § 820.30);

c.   Failure to validate a process whose results cannot be fully verified by subsequent inspections and tests, as bonding process for the Pt/Ir catheter has not been validated. (21 C.F.R. § 820.75(a));

d.   Failure to control production processes to ensure that a device conforms to its specification. (21 C.F.R. § 820.70(a));

e.   Failure to implement corrective and preventive action procedures addressing the investigation of the cause of nonconformities. (21 C.F.R. § 820.100(a)(2));

f.      Failure to implement changes in methods and procedures needed to correct and prevent identified quality problems. (21 C.F.R. § 820.100(a)(5));

g.      Failure to identify all of the actions needed to correct and prevent the recurrence of nonconforming product and other quality problems. (21 C.F.R. § 820.100(a)(3)); and

h.      Failure to implement procedures to ensure that device history records for each batch, or unit are maintained to demonstrate that the device is manufactured in accordance with regulations. (21 C.F.R. § 820.184).

106.    The FDA Warning Letter continued: "*[t]he specific violations noted in this letter and the Form FDA-483 . . . may be symptomatic of serious underlying problems in your firm's manufacturing quality assurance systems.*"[23]

107.    The FDA inspected the same Minneapolis Medtronic facility less than a year later, and on July 3, 2007 issued *another* Warning Letter concerning the SynchroMed® II Device. The FDA again warned Medtronic that their devices manufactured at the Minneapolis facility were "*adulterated*" and "*misbranded.*" A partial list of the violations the FDA found during the 2007 inspection includes:

a.      Medtronic failed to implement complaint handling procedures to ensure that all complaints are evaluated to determine whether the complaint represents an event that must be filed as a Medical Device Report (MDR).

b.      Medtronic failed to enter several medical and/or scientific literature articles discussing adverse events relating to devices the plant manufactured in the reporting system and failed to evaluate whether the adverse event related articles were required to be reported to the FDA under 21 C.F.R. § 803.50.

c.      Medtronic failed to submit MDR reports within thirty (30) days of receiving or otherwise becoming aware of information that reasonably suggests that a marketed

---

[23] *See* Ex. 8, August 29, 2006 FDA Warning Letter and Ex. 9, Form FDA 483, dated January 24, 2007.

device may have caused or contributed to a death or serious injury (21 C.F.R. § 803.50(a)(1)). Specifically, Medtronic:

  i.    Failed to report SynchroMed® II Device's intrathecal catheters associated with granuloma or inflammatory masses at or near the distal tip, which the FDA considers "serious injuries";

  ii.   Failed to report SynchroMed® II Device's intrathecal catheter fractures;

  iii.  Failed to report a malfunction MDR, required when a marketed device malfunction would likely cause or contribute to a reportable death or serious injury;

  iv.   Failed to submit MDR reports within thirty (30) days of learning of a problem (pump malfunctions, catheter fracture or separation, inflammatory masses and granulomas) of Medtronic's device in the literature;

  v.    Failed to report consumer self-reported adverse events. (21 C.F.R. § 803.50); and

  vi.   Failed to report to the FDA a correction or removal conducted to reduce a risk to health posed by a device. (21 C.F.R. § 806.2(d), 10(a)(1)).

108.    In the July 2007 letter, the FDA warned Medtronic "[y]our firm has several procedures for Medical Device Reporting and Adverse Drug Experience Reporting. These procedures, in turn reference several other procedures. Your firm's current problems regarding MDR reporting, as discussed above in this Warning letter, may be exacerbated by the complexity of your procedures and might have contributed to your firm's deviations from the regulations regarding MDR reporting."[24]

109.    The FDA inspection also revealed several ongoing violations at Medtronic's Minneapolis Plant's Quality System that were noted in a Form 483, stating "[t]he specific violations noted in this letter and Form FDA 483 may be symptomatic of serious underlying problems in your firm's manufacturing and Quality Assurance systems." Specifically, the FDA warned that Medtronic:

[24] See Ex. 10, July 3, 2007 FDA Warning Letter.

a.    Failed to achieve consistent compliance in areas such as design controls. (21 C.F.R. § 820.30); and

b.    Failed to achieve consistent compliance in Corrective and Preventative Action (CAPA). (21 C.F.R. § 820.100).[25]

110.   On June 1, 2009, the FDA issued a "Warning Letter" to Medtronic concerning their manufacturing facility in Juncos, Puerto Rico, detailing multiple violations of "Current Good Manufacturing Practice (CGMP) requirement of the Quality System (QS) regulation found at Title 21, Code of Federal Regulations (C.F.R.) part 820" based on inspections conducted in late 2008. Based upon those violations, the FDA determined that Medtronic's SynchroMed® II Devices were ***"adulterated"*** within the meaning of 831(h) of the Federal Food, Drug, and Cosmetic Act, 21 U.S.C. *et seq.* "in that the methods used in, or the facilities or controls used for, their manufacture, packing, sorting, or installation are not in conformity with the Current Good Manufacturing Practice (CGMP) requirements of the Quality System regulation found at Title 21 Code of Federal Regulations (C.F.R.) Part 820."[26]

111.   The 2009 FDA Warning Letter concerning the Puerto Rico manufacturing plant specifically cited Medtronic for the following with regard to the SynchroMed® II Device:

a.    Failure to establish and maintain process control procedures that describe any process controls necessary to ensure conformance to specifications, which shall include monitoring and control of process parameters and component and device characteristics during production;

b.    Failure to establish and maintain procedures for implementing corrective and preventive actions that include identifying the actions needed to correct and prevent recurrence of non-conforming product and other quality problems as required by 21 C.F.R. § 820.100(a);

---

[25] *Id.*
[26] *See* Ex. 6, June 1, 2009 FDA Warning Letter.

1  c.  Failure to establish and maintain procedures that ensure the Device History

2  Records (DHRs) for each batch, lot or unit are maintained to demonstrate that the device

3  is manufactured in accordance with the DHR as required by 21 C.F.R. § 820.184;

4  d.  Failure to review, evaluate and investigate complaint involving the possible

5  failure of a device, labeling or packaging to meet any of its specifications as required by

6  21 C.F.R. § 820.198(c);

7  e.  Failure to report to FDA no later than thirty (30) calendar days after the day

8  that Medtronic received or otherwise became aware of information from any source, that

9  reasonably suggests that a device Medtronic marketed: 1) may have caused or contributed

10  to a death or serious injury; or 2) has malfunctioned and this device or a similar device

11  that Medtronic marketed would be likely to cause or contribute to a death or serious

12  injury, if the malfunction were to recur, as required by 21 C.F.R. § 803.50(a);

13  f.  Failure to have a person who is qualified to make a medical judgment

14  reasonably conclude that a device did not cause or contribute to a death of serious injury,

15  or that a malfunction would not likely to cause or contribute to a death or serious injury if

16  it were to recur, as required by 21 C.F.R. § 803(c)(2); and

17  g.  Failure to ensure that persons qualified to make a medical judgment include

18  physicians, nurses, risk managers, and biomechanical engineers under 21 C.F.R. §

19  803.20(c)(2): "[O]ur investigators determine that a product reporting specialist was

20  making decisions about MDR reportability for the Medtronic SynchroMed® II

21  Implantable Pump Infusion System. The training record for this particular employee

22  showed that this person only had a high school diploma with some additional in-house

23  training."[27]

24  112.  At the time of inspection, the FDA informed Medtronic of the following

25  manufacturing defects in the SynchroMed® II Device:

26

27  _____

28  [27] *Id.*

a. Pumps manufactured without propellant. The FDA noted that while Medtronic *identified* this problem in May of 2006, and initiated a corrective and preventative action (CAPA) investigation in January 2007, Medtronic did not voluntarily recall the thirteen thousand five hundred fifteen (13,515) devices affected by this defect until May 2008, a *full two (2) years after the defect was identified*.

b. Pumps did not show evidence of perforated septum;

c. Pumps were missing a safety mechanism that served to assure that pumps are never overfilled; and

d. A *critical step was left out of the manufacturing proces*s, which is the calculation of drug reservoir levels and drug dispensing rates. Despite numerous complaints that Medtronic received regarding accuracy rates, Medtronic failed to conduct any type of investigation into this problem.

113. The FDA determined that the SynchroMed® II Device was ***"misbranded"*** by virtue of the cited violation involving the failure or refusal to furnish material or information required under the statute and regulations relating to information that the devices may have either caused or contributed to death or serious bodily injury, or malfunctions in such a way that if it were to recur would be likely to cause or contribute to a death or serious injury.

114. Additionally, while the FDA observed generally that the adequacy of Medtronic's responses could not be determined at the time, the FDA noted "the adequacy of your corrective and preventative measures will be determined during the next inspection." It specifically noted that Medtronic's response to the violation related to the "failure to establish and maintain procedures for implementing Corrective and Preventive Action (CAPA) procedures at [the Puerto Rico facility] will be conducted by July 31, 2009."[28]

115. In 2012, Medtronic's Minneapolis manufacturing plant was again inspected by the FDA. As a result of that inspection, the FDA issued a Warning Letter dated July

---

[28] *Id.*

17, 2012 identifying Medtronic's specific violations of federal regulations in the manufacture of SynchroMed® II Devices including violations of CGMPs and Quality Systems requirements. The FDA informed Medtronic that the SynchroMed® II Devices, including the catheter, were **"adulterated."**

116.    The FDA cited Medtronic for incomplete complaint data and incorrect coding decision. The FDA stated this violation "may have compromised Medtronic's ability to detect and investigate [safety] signals."[29]

117.    From February 14, 2013 through April 3, 2013, the FDA again inspected Medtronic's Neuromodulation manufacturing plant in Minneapolis. In April 2013, based on its inspection, the FDA informed Medtronic that the plant failed to manufacture devices that adequately conform to specifications and instead manufactured devices that are not adequately controlled. Specifically, Medtronic failed to establish procedures for corrective and preventative action for problems including:

a.    "Feed through shorting" resulting in motor stalls, whereby at least two hundred ninety-eight (298) serious adverse events have resulted from this defect;

b.    Based upon a reported problem with their device, Medtronic failed to implement a recommendation from its Risk Evaluation Board and delayed any action taken. Since the decision to delay the action, at least thirty-seven (37) serious adverse events have been possibly related to the problem; and

c.    Medtronic detected signals showing a problem with catheter occlusion, but failed to update a Health Hazard Assessment for this defect since 2008, with over three hundred (300) complaints occurring since that time.[30]

118.    Further, the FDA notified Medtronic of the following:

Regulatory approval was received for Supplement 136 to PMA P860004 on December 15, 2011 to change the design of SC Catheter models 8709 SC, 8731 SC, 8596 SC, and Revision Kit model 8578 to mitigate a known field issue associated with CAPA 1507-SC Catheter Occlusion. This

[29] *See* Ex. 12, July 17, 2012 FDA Warning Letter.
[30] *See* Ex. 11, Form FDA 483, Inspection Observations, dated February 14, 2013 – April 3, 2013.

34

design change was implemented via ECO 12-00985, date March 6, 2012, and the new revisions of Catheter models were released to the field in September 2012. However, the previous SC catheter models which do not conform to the current design have continued to be distributed and have been attributed to 60 complaints of catheter occlusion since September 2012.[31]

**E.     SynchroMed® II Device recalls initiated by the U.S. Food & Drug Administration**

119.    Since 2008, the FDA has issued nineteen (19) Class I Recall Actions for the SynchroMed® II Device. A recall is an action taken to address a problem with a medical device that violates federal law. Recalls occur when a medical device is defective, when it could be a risk to health, or when it is both defective and a risk to health.

120.    A Class I recall is the most serious recall category issued when there is a probability that the use of the product could cause serious health consequences or death. Any drug or medical device that has been the subject of a Class I recall can be deadly or cause serious life-long injury.

121.    Up to December 13, 2012, The Class I and Class II recalls issued for the SynchroMed® II Device include, but are not limited to:

a.      Formation of inflammatory masses near the tip of the intrathecal catheters (Class I, March 22, 2008);

b.      Pumps manufactured without propellant (Class II, September 3, 2008);

c.      Battery failure (Class II, September 29, 2009);

d.      Inadequate instruction for filling/refilling of pumps causing injection of all or some of the prescribed drug into the patient's subcutaneous tissue (Class I, August 29, 2011);

e.      Reduced battery performance leading to sudden loss of therapy (Class I, August 29, 2011);

f.      Software failure resulting in incorrectly displayed "scheduled to replace the pump by" date (Class II, March 30, 2012); and

---

[31] *Id.*

35

g.     Use of unapproved (off-label) drugs in the pumps leading to permanent motor stall and cessation of infusion (December 13, 2012).

122.   On June 3, 2013, the FDA issued two (2) Class I recalls related to the Medtronic SynchroMed® II Implantable Infusion Pump System.

a.     The first 2013 recall covers all of the SynchroMed® II pumps implanted worldwide manufactured from May 1998 through June 2013 and distributed from April 1999 through June 2013. In the letter, the FDA warned that the following would happen with the defective pumps:

i.     Unintended delivery of drugs during the priming bolus procedure can result in drug underdelivery and overdelivery, leading to respiratory depression, coma or death, and

ii.     Potential for electrical shorting, internal to the SynchroMed® II infusion pump, leading to a loss of or reduction in therapy, resulting in serious adverse health consequences including death. At the time of the 2013 recalls, there were two hundred sixty-one thousand, one hundred nine (261,109) SynchroMed® II Implantable Infusion Pumps System implanted worldwide.

b.     The second 2013 recall affects *all Sutureless Connector Intrathecal Catheters* in the SynchroMed® II Device**,** Models #8709SC, 8731SC, and Sutureless Revision Kits, Models #8596SC, and 8578 with a "use by" date of August 25, 2014. In the recall, the FDA noted the reasons for the recall:

i.     "The sutureless Connector Intrathecal Catheter connector has been redesigned to reduce the potential for occlusion, which is the blockage or stoppage of drug flow due to misalignment at the point where the catheter connects to an implantable pump. Medtronic is removing all unused products that were manufactured with the previous design. Medtronic recommends the previous design of Sutureless connector Intrathecal Catheter Products no longer be used due to greater potential for misalignment and subsequent occlusion."

ii.      "This product may cause serious adverse health consequences, including drug under dose, loss of symptom relief, drug withdrawal symptoms caused by the lack of drug delivery to the intrathecal space, and/or death."

**F.     The United States of America files a Complaint for Permanent Injunction against Medtronic, Inc. and executive individuals S. Omar Ishrak and Thomas M. Tefft**

123.    On April 27, 2015, the United States Department of Justice and United States Department of Health and Human Services filed a Complaint for Permanent Injunction against Medtronic, Inc. and individually against its Chairman and CEO, S. Omar Ishrak, and Medtronic's Senior Vice Present and Medtronic Neuro's President, Thomas M. Tefft, with respect to the manufacture of the SynchroMed® II Device.[32]

124.    The Complaint alleges that Medtronic, S. Omar Ishrak, and Thomas M. Tefft "are well aware that their practices violate the Act. FDA has repeatedly warned Defendants, both orally and in writing, about their violative conduct, and has emphasized the importance of Defendants' compliance with the Act."[33]

125.    In addition to the cited Warning Letters, the Complaint alleges that representatives of Medtronic attended a meeting with FDA's Center for Devices and Radiological Health and Minneapolis District Office on January 31, 2013. At this meeting, "*Defendants stated that they were aware of the violations at their facilities and were taking steps to correct them*."[34]

126.    The Complaint further alleges Medtronic made promises to correct their violations in written responses to each inspection; however, the Complaint alleged that none of the responses contained adequate evidence that Medtronic corrected their deviations.

127.    The United States Attorney stated in the Complaint that, "*[b]ased upon Defendants' conduct, Plaintiff believes that, unless restrained by order of this Court,*

---

[32] *See* Ex. 7, Complaint for Permanent Injunction.
[33] *Id*.
[34] *Id*.

37

*Defendants will continue to violate 21 U.S.C. §§ 331(a) and (k)* [introducing into interstate commerce any article of device that is **adulterated**, or causing any article of device to become **adulterated** within the meaning of 21 U.S.C. § 351 (h) while such devices are held for sale after shipment in interstate commerce]."[35]

128.    The United States of America's Complaint requested a permanent injunction to restrain Medtronic, in their manufacture of the SynchroMed® II Device, from their continued violation of federal regulations, and,

> That the Court order Defendants and each of their directors, officers, agents, representatives, employees, attorneys, successors, and assigns, and any and all persons in active concert or participation with any of them, to cease directly and indirectly manufacturing, packing, labeling, and distributing (domestically and internationally) SynchroMed II implantable infusion pumps at or from its Medtronic's Neuromodulation faculties, unless and until Defendants' methods, facilities, and controls used to manufacture, process, pack, label, hold and distribute the SynchroMed II implantable infusion pumps are established, operated, and administered in compliance with 21 USC 360j(f)(1) and the Quality System regulation prescribed in 21 C.F.R. Part 820, and in a manner that has been found acceptable to FDA.[36]

129.    On April 27, 2015, United States District Court Judge Joan N. Ericksen signed a Consent Decree of Permanent Injunction against Medtronic preventing the manufacture and distribution of the Medtronic SynchroMed® Implantable Infusion Pump systems in violation of the terms of the Consent Decree.[37]

130.    Under the Consent Decree, Medtronic is "permanently restrained and enjoined, pursuant to 21 U.S.C. § 332(a), from directly or indirectly designing, manufacturing, processing, packing, labeling, holding, storing, and distributing, importing into or exporting from the United States of America, at or from any Medtronic Neuromodulation facilities, any model of, or components or accessories for, its SynchroMed devices." Under the Consent Decree, the permanent injunction would be

---

[35] *Id.*

[36] *Id.*

[37] *See* Ex. 13, Consent Decree of Permanent Injunction.

lifted only in the event that Medtronic complies with a series of enumerated requirements to ensure that it would cease violating federal law in the production of its SynchroMed® II Device.

131.    Upon information and belief, Medtronic continues to produce, distribute, and sell their SynchroMed® II Device in violation of the Decree.

### IV.    CAUSES OF ACTION

#### COUNT I
#### MANUFACTURING DEFECT

132.    Plaintiff incorporates by reference, as if fully set forth herein, each and every allegation contained in the preceding paragraphs of this Complaint.

133.    The SynchroMed® II Device implanted in Francisco C. Perez's abdomen was manufactured in violation of the Federal Food, Drug, and Cosmetic Act, the Medical Device Amendments, and federal regulations promulgated pursuant to these laws. The SynchroMed® II Device implanted in Mr. Perez's abdomen was manufactured in violation of Arizona and Minnesota law that parallels federal requirements set forth herein.

134.    As a result of Medtronic's violations of federal statutory and regulatory standard of care and device specific regulations, the SynchroMed® II Device implanted in Francisco C. Perez's abdomen failed and required revision and removal surgeries.

135.    At the time the SynchroMed® II Device implanted into Francisco C. Perez's abdomen left the control of Medtronic, it was unreasonably dangerous due to Medtronic's violations of the Federal Food, Drug, and Cosmetic Act, the Medical Device Amendments, and the regulations promulgated pursuant to these laws in one or more of the following ways:

a.    The SynchroMed® II Device was introduced or delivered for introduction into interstate commerce was ***adulterated*** in violation of 21 U.S.C. §§ 331, 351(h) and 21 C.F.R. Part 820;

b.      The SynchroMed® II Device was ***adulterated*** in interstate commerce in violation of 21 U.S.C. §§ 331, 351 (h) and 21 C.F.R. Part 820;

c.      The SynchroMed® II Device was received in interstate commerce ***adulterated*** and was delivered for pay or otherwise, in violation of 21 U.S.C. §§ 331, 351(h) and 21 C.F.R. Part 820; and

d.      The SynchroMed® II Device implanted in Francisco C. Perez was ***adulterated*** because it was manufactured in deviation from the manufacturing specifications approved by the FDA in Medtronic's PMA application in violation of the Federal Food, Drug, and Cosmetic Act, and failed to comply with CGMPs requirements.

136.    Defendants are medical device companies engaged in the design and/or research and/or manufacture and/or production and/or testing and/or assembling and/or labeling and/or packaging and/or distribution and/or sale and/or otherwise involved in placing in the stream of commerce various medical devices, as hereinbefore set forth, intended for human use including facilitating the infusion and/or consumption and ingestion of pharmaceutical products for the treatment of specific medical conditions.

137.    At all times relevant hereto, Defendants, and each of them, held themselves out as knowledgeable and possessing the requisite skill peculiar to the research and/or manufacture and/or production and/or testing and/or assembling and/or labeling and/or packaging and/or distribution and/or sale of such product(s).

138.    At all times relevant hereto, federal law required Defendants to manufacture the SynchroMed® II Device in compliance with federal specifications and requirements imposed through the PMA process for the device, and in compliance with post-approval federal regulations, including but not limited to those set out in 21 C.F.R. § 801, *et seq*., 21 C.F.R. 803, *et seq.*, 21 C.F.R. § 814, *et seq.*, 21 C.F.R. § 806, *et seq*., 21 C.F.R. § 820, *et seq*., and 21 U.S.C. §§ 351-352. Such regulations are promulgated to ensure a manufactured device is free from a defective condition unreasonably dangerous to the consumer.

40

139.   At the times relevant hereto, as a manufacturer of a medical device, under Arizona and Minnesota law, Defendants were required to use reasonable care in the manufacture, assembly, inspection, packaging, testing of SynchroMed® II Device to protect users such as Francisco C. Perez. Reasonable care under the circumstances for a device manufacturer would include complying with federal regulations designed to ensure manufacture of conforming products, assembly, inspection, packaging, and testing of medical devices in compliance with specifications and CGMP requirements.

140.   Defendants breached their duty under Arizona and Minnesota law in that they failed use reasonable care to ensure that Francisco C. Perez's SynchroMed® II Device complied with federal requirements, manufactured Francisco C. Perez's SynchroMed® II Device in a way that did not comply with their federal requirements, and failed to test and inspect the SynchroMed® II Device before placing it into the stream of commerce and made it available for sale to Miss Jones. In so doing, Defendants failed to comply with manufacturing requirements imposed by the Device's PMA requirements and post-approval regulations.

141.   During the time Mr. Perez's SynchroMed® II Device was manufactured, the FDA discovered that Medtronic knew, based upon its own internal investigations and audits of its manufacturing practices, that its SynchroMed® II Devices did not comply with its own manufacturing specifications designed to ensure a device did not overinfuse or underinfuse medication into a patient and that leaving out the necessary steps caused the device to malfunction, causing harm to consumers, including Miss Jones, who used the defective device.

142.   Medtronic, regardless of the seriousness of the harm to the patient, failed to conduct any type of investigation of complaints from the field related to inaccurate drug reservoir levels and inaccurate dispensing rates, including reported field complaints of overinfusion and underinfusion of the medication.

143.   As part of its internal audit, Medtronic's internal report reviewed: "[t]he intent of the (b)(4) was to provide another level of oversight to ensure that in-process tests

were actually being performed on devices, as they progressed through manufacturing. This report, however revealed that another step (b)(4) **for each SynchroMed II pump was not performed during manufacturing**."[38]

144.    The failure to perform this step affected devices such as the SynchroMed® II Device implanted in Miss Jones. "(b)(4) [redacted] are unique to each device and have values that vary from (b)(4). This constant is used by the device in *critical internal functions such as calculating drug reservoir levels and drug dispensing rates.*"[39]

145.    Medtronic's manufacture of the SynchroMed® II Device, failed to conform with post-manufacturing regulations imposed by mandatory safety requirements under the CGMPs, and its reporting obligations under the Medical Device Reporting requirements (MDR), both of which are mandatory obligations imposed on Medtronic as part of its PMA requirements for the SynchroMed® II Device.

146.    Specifically, there were over (b)(4) [redacted] Complaints in Medtronic's Complaint handling system related to accuracy rates. Medtronic failed to conduct any investigating NCR [Nonconformance Report] or other type of investigation into this problem.[40]

147.    Medtronic knew at all material times before Mr. Perez was implanted with a SynchroMed® II Device, that the company failed to have a Quality Control System in place that ensured the delivery rate of the pump operated as programmed.

148.    Medtronic knew at all material times before Mr. Perez was implanted with a SynchroMed® II Device, that based upon its own internal audits and complaints from the field, that the SynchroMed® II Device implanted in Mr. Perez was manufactured without necessary steps designed to prevent overinfusion and underinfusion and ensure an accurate delivery rate of medications.

149.    Medtronic knew at all material times that it failed to properly inform the FDA of reported field problems with adequately controlled delivery rates. Had Mr. Perez

---

[38] *Id.*
[39] *Id.*
[40] *Id.*

and his medical providers known the SynchroMed® II Device were not manufactured according to PMA specifications, and that the nonconforming products could result in the overinfusion and underinfusion of medications that caused significant suffering in Mr. Perez and resulted in his death, Mr. Perez would have avoided use of the defective device as a means to deliver his needed medications.

150.   Medtronic knew at all material times that when it omitted a step in the manufacturing process of each SynchroMed® II Device that ensured accurate pump delivery rate, preventing overinfusion of medication to consumers, it manufactured the devices in violation of its own specifications and PMA requirements, and thereby placed into the market nonconforming, defective goods, in violation of federal law. Further that the violative manufacturing process resulted in a defect as reflected in its Class I Recall of the SynchroMed® II Device due to overinfusion that harmed consumers, including Miss Jones.

151.   In addition, as evidenced by the August 29, 2006 FDA Warning Letter,[41] Medtronic committed "significant deviations" in the manufacture of Francisco C. Perez's catheters in his SynchroMed® II Device.

152.   The Warning Letter, which was "not intended to be an all-inclusive list of deficiencies at your facility" put Medtronic on notice of significant and substantially similar problems with failures in their intrathecal catheters in which Medtronic:

a.   Failed to validate the design for the catheter bond tip;

b.   Failed to ensure the catheter complied with specifications for the manufacture of the Device;

c.   Failed to investigate the cause of non-conforming catheters;

d.   Failed to implement changes needed to correct and prevent quality problems in the catheter;

---

[41] *See* Ex. 8, August 29, 2006 FDA Warning Letter and Ex. 9, Form FDA 483, dated January 24, 2007.

1      e.      Failed to ensure that the finished devices (catheters) were "safe and

2 effective" and otherwise in compliance with the Federal Food, Drug and Cosmetic Act";

3 and

4      f.      Based upon the "out-of-specifications" manufacture of Francisco C. Perez's

5 SynchroMed® II Device, the FDA determined that his catheters as manufactured by

6 Defendants, were "adulterated."

7      153.    Francisco C. Perez suffered injury due to two (2) non-conforming,

8 adulterated, and defective intrathecal catheters in his SynchroMed® II Device. These

9 catheters were noted by his medical providers to be frayed and broken, and thereby failed

10 to properly deliver medication to Mr. Perez's treatment site as programmed by his medical

11 providers.

12      154.    As a result of Medtronic's failure to use reasonable care in complying with

13 federal law in the manufacture of Francisco C. Perez's SynchroMed® II Device,

14 Francisco C. Perez's catheters were manufactured out of specification, were non-

15 conforming, adulterated, and had the propensity for fracturing and did fray, fracture, and

16 break.

17      155.    As a foreseeable, direct and proximate result of Defendants' failure to

18 manufacture Francisco C. Perez's SynchroMed® II Device in conformance with

19 specifications imposed by law, Mr. Perez device was defective and failed. Mr. Perez

20 endured additional surgical procedures in attempt to correct the defects in his

21 SynchroMed® II Device and continued to experienced severe pain and suffering that

22 ultimately resulted in his death, and other damages compensable by law.

23
24

**COUNT II**
**FAILURE TO WARN**

25      156.    Plaintiff incorporates by reference, as if fully set forth herein, each and

26 every allegation contained in the preceding paragraphs of this Complaint.

27      157.    Defendants are medical device entities engaged in the design and/or

28 research and/or manufacture and/or production and/or testing and/or assembling and/or

44

labeling and/or packaging and/or distribution and/or sale and/or otherwise placing into the stream of commerce various medical devices intended for human use, including the SynchroMed® II Device, which is a surgically implanted device that delivers medication into the intrathecal space of patients for the treatment of chronic pain, and as an alternative to oral pain medication.

158.    At all times relevant hereto, Medtronic had a continuing duty to monitor the SynchroMed® II Device placed into the stream of commerce, to discover and report to the FDA any complaints about the product's performance and any adverse health consequences of which Medtronic became aware, and that are or may be attributable to the product. (FD&C Act, Medical Device Reporting Title 21, Code of Federal Regulations (C.F.R.), Part 803)) "[R]equires manufacturers, distributors, and initial distributors of medical devices to establish, maintain a record of and report the result to FDA certain adverse events that they receive from any source, and to establish and maintain reports."

159.    At all times relevant hereto, under Arizona and Minnesota law, Defendants had a duty to disclose to the FDA, of potentially dangerous risks involved in their product's use. Such duty imposes an obligation on Medtronic to timely inform the FDA when Medtronic learned of the propensity for a catheter malfunction and device malfunction that caused medication overdosing and underdosing due to a defectively manufactured pump.

160.    Medtronic breached its duty under federal, Arizona, and Minnesota law, by not informing the FDA of serious field complaints related to the SynchroMed II devices, as evidenced by cited violations in the FDA warning letters.

161.    As reported to the FDA, in violation of its duties under the Medical Device Reporting requirements imposed pursuant to the PMA requirements, Medtronic, regardless of the seriousness of the harm to the patient, failed to conduct any type of investigation of complaints from the field related to inaccurate drug reservoir levels and inaccurate dispensing rates, including reported field complaints of overinfusion and underinfusion of the medication.

162.    Specifically related to inaccurate drug reservoir levels and inaccurate dispensing rates, the FDA wrote that Medtronic violated 21 C.F.R. § 820.100(a) by its "[f]ailure to establish and maintain procedures for implementing corrective and preventative action that include identifying the actions necessary and mandated by federal law to correct and prevent recurrence of nonconforming product and other quality problems, as required by 21 CFR 820.100(a)".[42]

163.    Additionally, the FDA Warning Letter wrote, "[o]ur investigators found over (b)(4) [redacted] Complaints in your firms' Complaint handling system related to accuracy rates. The (b)(4) [redacted] report did not reference any NCR [Nonconformance Report] or other type of investigation into this problem."[43]

164.    Medtronic knew at all material times that it failed to properly inform the FDA of reported field problems with adequately controlled delivery rates. Had Plaintiff and Plaintiff's medical providers known the SynchroMed® II Device were not manufactured according to PMA specifications, and that the nonconforming products could result in the overinfusion and underinfusion of medications that caused significant suffering in Mr. Perez and resulted in his death, Plaintiff would have avoided use of the defective device as a means to deliver his needed medication.

165.    Medtronic knew at all material times that when it omitted a step in the manufacturing process of each SynchroMed® II Device that ensured accurate pump delivery rate, preventing overinfusion of medication to consumers, it manufactured the devices in violation of its own specifications and PMA requirements, and thereby placed into the market nonconforming, defective goods, in violation of federal law. Further that the violative manufacturing process resulted in a defect as reflected in its Class I Recall of the SynchroMed® II Device due to overinfusion that harmed consumers, including Miss Jones.

166.    With regard to failing to report catheter defects to the FDA, Medtronic

---

[42] *Id.*
[43] *Id.*

a.     failed to report problems with devices, including catheter separation or fracture;[44]

b.     failed to report consumer generated adverse events;

c.     failed to report that in 2008, Medtronic detected a "signal" showing a problem with catheter occlusion in the SynchroMed® II Device, but failed to update a Health Hazard Assessment for this defect until 2011;[45]

d.     failed to report under 21 C.F.R. § 803, a "malfunction" event for an adverse event, such as when a catheter fractures;[46] and

e.     failed to submit FDA-mandated Medical Device Reports (MDRs) within thirty (30) days of becoming aware that the SynchroMed® II Device (including the catheter) caused or contributed to a death or serious injury, under 21 C.F.R. § 803.50(a)(1), thereby resulting in the devices being "misbranded."[47]

167.    Medtronic knew at all times before Francisco C. Perez was implanted with his original SynchroMed® II Device, that the catheter he received was defective in that the catheter failed due to a high rate of occlusion, fracture, breakage, and obstruction, yet it failed to inform the FDA of the danger.

168.    Because Medtronic failed to comply with their duty under federal law, they breached their "duty to use reasonable care" under Arizona and Minnesota law to disclose material risks of the SynchroMed® II Device to the FDA and the public, including Francisco C. Perez. This duty parallels Medtronic's requirements under federal law to timely and properly report adverse events and safety issues relating to the SynchroMed® II Device.

169.    Had the FDA been properly and timely warned of the high failure rates of the intrathecal catheters, Francisco C. Perez and his medical providers would have learned

---

[44] *See* Ex. 10, July 3, 2007 FDA Warning Letter.
[45] *Id.*
[46] *Id.*
[47] *Id.*

of the high failure rates of catheters and heeded that warning, thereby avoiding use of the intrathecal catheters.

170.   As a foreseeable, direct and proximate result of Medtronic's failure to warn, as set forth above, about the defective condition of the SynchroMed® II Device, Francisco C. Perez experienced severe pain and suffering that ultimately resulted in his death, which he endured an additional surgical procedure in attempt to correct the defects in his SynchroMed® II Device, and other damages compensable by law.

## COUNT III
## NEGLIGENCE

171.   Plaintiff incorporates by reference, as if fully set forth herein, each and every allegation contained in the preceding paragraphs of this Complaint.

172.   Defendants, and each of them, are medical device entities engaged in the design and/or research and/or manufacture and/or production and/or testing and/or assembling and/or labeling and/or packaging and/or distribution and/or sale and/or otherwise placing into the stream of commerce various medical devices intended for human use, including the SynchroMed® II Device, which is a surgically implanted device that delivers medication into the intrathecal space of patients for the treatment of chronic pain, and as an alternative to oral pain medication.

173.   At all times relevant hereto, Defendants manufactured, distributed and sold Francisco C. Perez's SynchroMed® II Device, comprising of a pump and catheter. Mr. Perez used his SynchroMed® II Device as intended by the Medtronic.

174.   Under Arizona and Minnesota law, every manufacturer, including Medtronic has a duty to use reasonable care to avoid foreseeable dangers in their products, as well as a duty to prevent the introduction of adulterated or misbranded products into the stream of commerce. Specifically, Medtronic at all relevant times hereto had a duty to use reasonable care in the manufacturer, testing, monitoring, inspection, assembly, and sale of Francisco C. Perez's SynchroMed® II Device. Such duties are parallel to those imposed under federal law.

175.   Federal law imposes post-market requirement on Medtronic, including those found under 21 C.F.R. § 820, *et seq*., which promulgates Current Good Manufacturing Practices (CGMPs). The quality control requirements of the CGMPs are designed to ensure Medtronic's products conform to manufacturing specifications, that non-conforming products do not reach the market, and that problems with products in the field are properly monitored, tracked and reported. The CGMPs require Medtronic to evaluate signals of unexpected or serious events of injury in the field and report to the FDA when a device causes, or is suspected to cause, injury in the field. A device that has been manufactured, monitored, packed, stored, inspected, or installed in violation of this requirement is deemed to be adulterated. 21 C.F.R. § 351 (h). A manufacturer is prohibited from introducing, delivering, or selling an adulterated device into interstate commerce. 21 C.F.R. § 331(a), (k).

176.   As a result of numerous FDA inspections from 2006-2013 to Medtronic's manufacturing plants in Minneapolis, Minnesota and Juncos Puerto Rico, as alleged herein, the FDA determined the SynchroMed® II Device and, in particular, the intrathecal catheters implanted in Francisco C. Perez's body, were "adulterated" and "misbranded" and thereby violated specific CGMPs as outlined *supra* in paragraphs herein.

177.   Medtronic violated their duty to comply with their obligations to manufacture their SynchroMed® II Device in conformity with CGMPs and prevent the introduction of adulterated or misbranded products into the stream of commerce, and therefore could not ensure the safety and effectiveness of the SynchroMed® II Device received by Francisco C. Perez.

178.   As a foreseeable, direct and proximate result of the Medtronic's failure to use due care to avoid foreseeable dangers in their SynchroMed® II Device, Francisco C. Perez's SynchroMed® II Device was manufactured out of specification and was misbranded and adulterated in violation of federal law.

179.   As a further foreseeable, direct and proximate result of Medtronic's failure to use due care to avoid foreseeable dangers in their SynchroMed® II Device, Francisco

49

C. Perez's nonconforming Device failed to deliver medication into his intrathecal space at the programmed rate, causing severe pain and suffering that ultimately resulted in his death, which he endured an additional surgical procedure in attempt to correct the defects in his SynchroMed® II Device, and other damages compensable by law.

## COUNT IV
## NEGLIGENCE PER SE

180. Plaintiff incorporates by reference as if fully set forth herein, each and every allegation contained in the preceding paragraphs of this Complaint.

181. Under Arizona and Minnesota law, a manufacturer has a duty to follow product safety regulations, and a violation of Food Drug, and Cosmetic Act, 21 U.S.C. § 301, *et seq*., establishes negligence per se and causes products to be defective as a matter of law.

182. The purpose of the Federal Food, Drug & Cosmetic Act is to protect consumers such as Francisco C. Perez from physical injury when they use a medical device. The injuries suffered by Mr. Perez are the types of injuries against which the Act is meant to protect.

183. Medtronic breached this duty, as evidenced in the aforementioned FDA Warning Letters, and FDA Form 483s, the provisions of the Food Drug and Cosmetic Act, including but not limited to: Medtronic failed to conform with post-manufacturing regulations imposed by mandatory safety requirements under the CGMPs its reporting obligations under the Medical Device Reporting requirements (MDR), and to ensure all steps were completed during the manufacture process of Mr. Perez's SynchroMed II device. Each of these obligations are mandatory obligations imposed on Medtronic as part of its PMA requirements for the SynchroMed® II Device.

184. Medtronic knew, based upon its own internal investigations and audits of its manufacturing practices, that its SynchroMed® II Devices did not comply with its own manufacturing specifications designed to ensure a device did not overinfuse or underinfuse medication into a patient and that leaving out the necessary steps caused the

device to malfunction, causing harm to consumers, including Miss Jones, who used the defective SynchroMed® II Device.

185.   The result of its own internal audit, a Medtronic report reveal, "[t]he intent of the (b)(4) was to provide another level of oversight to ensure that in-process tests were actually being performed on devices, as they progressed through manufacturing. This report, however revealed that another step (b)(4) **for each SynchroMed II pump was not performed during manufacturing**."[48]

186.   Medtronic's failure to perform this step affected devices such as the SynchroMed® II Device implanted in Miss Jones. "(b)(4) [redacted] are unique to each device and have values that vary from (b)(4). This constant is used by the device in *critical internal functions such as calculating drug reservoir levels and drug dispensing rates.*"[49]

187.   Medtronic, regardless of the seriousness of the harm to the patient, failed to conduct any type of investigation of complaints from the field related to inaccurate drug reservoir levels and inaccurate dispensing rates, including reported field complaints of overinfusion and underinfusion of the medication.

188.   As cited in an FDA Warning Letter: "[o]ur investigators found over (b)(4) [redacted] Complaints in your firms' Complaint handling system related to accuracy rates. The (b)(4) [redacted] report did not reference any NCR [Nonconformance Report] or other type of investigation into this problem."[50]

189.   Medtronic knew at all material times that when it omitted a step in the manufacturing process of each SynchroMed® II Device that ensured accurate pump delivery rate, preventing overinfusion of medication to consumers, it manufactured the devices in violation of its own specifications and PMA requirements, and thereby placed into the market nonconforming, defective goods, in violation of federal law. Further that the violative manufacturing process resulted in a defect as reflected in its Class I Recall of

---

[48] *Id.*
[49] *Id.*
[50] *Id.*

the SynchroMed® II Device due to overinfusion that harmed consumers, including Mr. Perez.

190.    In addition to omitting the necessary steps to prevent the pump from overinfusing and underinfusing medication to a patient, the FDA determined that Medtronic, regardless of the seriousness of the harm to the patient, failed to conduct any type of investigation of complaints from the field related to inaccurate drug reservoir levels and inaccurate dispensing rates, including reported field complaints of overinfusion and underinfusion of the medication.

191.    Medtronic knew at all material times before Mr. Perez was implanted with a SynchroMed® II Device, that based upon its own internal audits and complaints from the field, that the SynchroMed® II Device implanted in Mr. Perez was manufactured without necessary steps designed to prevent overinfusion and underinfusion and ensure an accurate delivery rate of his medications.

192.    Medtronic knew at all material times that it failed to properly inform the FDA of reported field problems with adequately controlled delivery rates. Had Plaintiff and Plaintiff's medical providers known the SynchroMed® II Device were not manufactured according to PMA specifications, and that the nonconforming products could result in the overinfusion and underinfusion of medications that caused significant suffering in Mr. Perez and resulted in his death, Plaintiff would have avoided use of the defective device as a means to deliver his needed medication.

193.    Medtronic knew at all material times before Mr. Perez was implanted with a SynchroMed® II Device, that the company failed to have a Quality Control System in place that ensured the delivery rate of the pump operated as programmed.

194.    In its Warning Letters specifically addressing missing steps related to inaccurate drug reservoir levels and inaccurate dispensing rates, the FDA wrote that Medtronic violated 21 C.F.R. § 820.100(a) by its "[f]ailure to establish and maintain procedures for implementing corrective and preventative action that include identifying

1  the actions necessary and mandated by federal law to correct and prevent recurrence of

2  nonconforming product and other quality problems, as required by 21 CFR 820.100(a)".[51]

3    195.    Medtronic knew at all material times that it failed to properly inform the

4  FDA of reported field problems with adequately controlled delivery rates. Had Plaintiff

5  and Plaintiff's medical providers known the SynchroMed® II Device were not

6  manufactured according to PMA specifications, and that the nonconforming products

7  could result in the overinfusion and underinfusion of medications that caused significant

8  suffering in Mr. Perez and resulted in his death, Mr. Perez would have avoided use of the

9  defective device as a means to deliver his needed medication.

10    196.    Medtronic knew at all material times that when it omitted a step in the

11  manufacturing process of each SynchroMed® II Device that ensured accurate pump

12  delivery rate, preventing overinfusion of medication to consumers, it manufactured the

13  devices in violation of its own specifications and PMA requirements, and thereby placed

14  into the market nonconforming, defective goods, in violation of federal law. Further that

15  the violative manufacturing process resulted in a defect as reflected in its Class I Recall of

16  the SynchroMed® II Device due to overinfusion that harmed consumers, including Miss

17  Jones.

18    197.    Medtronic further breached this duty in that it violated, pursuant to the

19  above identified Warning Letters, FDA Form 483, and Inspection Reports, the provisions

20  of the Food Drug and Cosmetic Act, including but not limited to the following

21  "significant deviations" from CGMPs while manufacturing their catheters in that

22  Medtronic:

23    a.    Failed to ensure the catheter complied with specifications for the

24  manufacture of the device;

25    b.    Failed to investigate the cause of non-conforming catheters;

26    c.    Failed to implement changes needed to correct and prevent quality problems

27  in the catheter;

28  _____

[51] *Id.*

53

1      d.      Failed to ensure that the finished catheters were "safe and effective" and

2  otherwise in compliance with the Federal Food, Drug and Cosmetic Act;

3                                          . . .

4      g.      Manufactured Francisco C. Perez's intrathecal catheter outside of

5  specifications set forth in applicable federal requirements, resulting in the FDA's

6  determination that Mr. Perez's catheter as manufactured by Defendants was

7  "adulterated;"[52] and

8      h.      Failed to update a Health Hazard Assessment for the 8709SC catheter

9  related to catheter occlusion.[53]

10     198.    As a result of the deviations from specifications and violations of federal

11 law, Medtronic manufactured catheters with a propensity for occlusion, breakage, and

12 fracturing. Such catheters were implanted in Francisco C. Perez's body and failed during

13 their normal use, which prevented accurate delivery of medication to Mr. Perez's

14 intrathecal space at the programmed rate and prevented the treatment the device was

15 designed to provide.

16     199.    Because his SynchroMed® II Device could no longer effectively deliver

17 medication to the treatment site in a safe manner, Francisco C. Perez's SynchroMed® II

18 Device caused significant injuries and required revision and ultimately removal.

19     200.    Defendants' failure to manufacture the SynchroMed® II Device in

20 accordance with applicable federal regulations constitutes negligence *per se*.

21     201.    As a foreseeable, direct and proximate result of Medtronic's negligence per

22 se, Francisco C. Perez experienced severe pain and suffering that ultimately resulted in his

23 death, which he endured an additional surgical procedure in attempt to correct the defects

24 in his SynchroMed® II Device, and other damages compensable by law.

25

26

27  ───────────────
    [52] *See* Ex. 10, July 3, 2007 FDA Warning Letter.
28  [53] *See* Ex. 11, Form FDA 483, Inspection Observations, dated February 14, 2013 – April
    3, 2013.

## COUNT V
## BREACH OF EXPRESS WARRANTY

202.   Plaintiff incorporates by reference as if fully set forth herein, each and every allegation contained in the preceding paragraphs of this Complaint.

203.   At all times relevant hereto, Medtronic expressly warranted and promised by way of written literature, advertisements, and/or other documents and/or promotional materials directed to Francisco C. Perez and his medical providers, that despite the significant cost difference in therapy, the use of an implanted SynchroMed® II Device designed to deliver medication to the intrathecal space was a superior and safer method than oral medication and/or alternative means of therapy to treat his muscle spasticity.

204.   Francisco C. Perez and his medical providers received, heard, and/or read Medtronic's express warranties that the SynchroMed® II Device conformed to FDA regulations and specifications, and was safe, effective, and fit and proper for its intended uses and foreseeable uses.

205.   Based upon Medtronic's representations of the significant benefits of the SynchroMed® II Device as compared to other forms of medication delivery or treatment for pain, Francisco C. Perez purchased and underwent surgery for implantation of the SynchroMed® II Device.

206.   Francisco C. Perez and his medical providers received, heard, and/or read Medtronic's express warranties that the SynchroMed® II Device conformed to FDA regulations and specifications, and was safe, effective, and fit and proper for its intended uses and foreseeable uses.

207.   Francisco C. Perez and his medical providers relied upon Medtronic's express warranties that the SynchroMed® II Device conformed to FDA regulations and specifications, and was safe, effective, and fit and proper for its intended uses and foreseeable uses, when in fact it was manufactured in violation of federal regulations and specifications and was unsafe and unfit for such uses.

208.   Defendants breached their express warranties because the warranty and representations were untrue in that:

55

a.     The FDA had determined that the Medtronic SynchroMed® II Device implanted in Francisco C. Perez was manufactured in violation of federal regulations and specifications, including CGMPs;

b.     The FDA violations of CGMPs committed by Medtronic meant that Medtronic was unable to confirm that the SynchroMed® II Device implanted in Francisco C. Perez was safe and effective, fully conformed to specifications, and was free of defects that could lead to malfunctions having the potential to cause or contribute to serious bodily injury; and

c.     The FDA had determined that the SynchroMed® II Device implanted in Francisco C. Perez was manufactured at a time when SynchroMed® II Devices were labeled "adulterated" and "misbranded."

209.   As a result of the aforementioned breach of their express warranties by Medtronic, Francisco C. Perez experienced severe pain and suffering that ultimately resulted in his death, which he endured an additional surgical procedure in attempt to correct the defects in his SynchroMed® II Device, and other damages compensable by law.

## COUNT VI
## BREACH OF IMPLIED WARRANTIES

210.   Plaintiff incorporates by reference as if fully set forth herein, each and every allegation contained in the preceding paragraphs of this Complaint.

211.   Prior to purchasing the Medtronic's SynchroMed® II Device, Defendants provided Francisco C. Perez and his medical providers written advertising materials (which were not part of the pre-approval process) describing the SynchroMed® II Device as a better alternative to receiving oral medications in that it was:

a.     "a safer way to receive pain medication";

b.     "Help you rejoin life so you can get back to the activities and people that make you happiest";

c.     "allows you to 'Tame your Pain'";

d.    "reduce your need for oral medications";

e.    "provide peace of mind knowing that you've selected a drug delivery system that was manufactured by Medtronic . . .";

f.    "give reassurance because only Medtronic offers a programmable drug delivery system that is FDA approved for MRI scans . . .";

g.    "drug delivery therapy from Medtronic is proven safe and effective therapy";

h.    "Medtronic drug delivery therapy has been tested, is shipped sterile, and is FDA approved"; and

i.    "More doctors trust Medtronic than any other company offering drug delivery therapy."

212.    Francisco C. Perez and his medical providers relied on the written advertisements of Medtronic related to the SynchroMed® II Device, leading to the implantation of the Device into Francisco C. Perez's body.

213.    The SynchroMed® II Device implanted in Francisco C. Perez failed to perform its essential purpose, which was to deliver programmed medications into his intrathecal space.

214.    Francisco C. Perez's SynchroMed® II Device, which lacked a catheter free from defect, was not reasonably fit for ordinary use or use in the manner ordinarily contemplated. Accordingly, Medtronic breached its implied warranty of merchantability with respect to Francisco C. Perez's SynchroMed® II Device.

215.    At the time and place that Francisco C. Perez purchased and used the SynchroMed® II Device, Mr. Perez relied upon Medtronic's implied warranties, not knowing that Medtronic knew, that in fact the SynchroMed® II Device was unfit and unsafe for its ordinary use, and had been found by the FDA to be "**adulterated**" and "**misbranded**" in that it was not manufactured, and/or packaged, and/or labeled in accordance with FDA regulations, did not perform in accordance with approved

specifications, and was therefore not safe nor effective for the intended, known, or foreseeable uses, nor of merchantable quality, as warranted by Medtronic.

216.    As a result of Medtronic's aforementioned breach of their implied warranties, Francisco C. Perez, after purchasing and being implanted with, and utilizing Medtronic's non-conforming, defective products, experienced severe pain and suffering that ultimately resulted in his death, which he endured additional procedures in attempt to correct the defects in his SynchroMed® II Device, and other damages compensable by law.

**COUNT VII**
**NEGLIGENT MISREPRESENTATION**

217.    Plaintiff incorporates by references, as if fully set forth herein, each and every allegation contained in the preceding paragraphs of this Complaint.

218.    At all times relevant hereto, Medtronic had a duty under Arizona law to advertise and represent correct information regarding the SynchroMed® II Device, as such information involves public welfare and safety.

219.    At all times relevant hereto, Defendants negligently misrepresented to Francisco C. Perez and his medical providers that the SynchroMed® II Device implanted in Mr. Perez was safe and effective, despite knowing that the SynchroMed® II Device was defective and capable of causing the injuries described herein.

220.    Defendants made the aforesaid representations with no reasonable ground for believing them to be true when Defendants possessed data showing the SynchroMed® II Device to be defective and dangerous when used in the intended manner.

221.    The aforesaid representations were made to the medical providers prescribing the SynchroMed® II Device prior to the dates prescribed to Francisco C. Perez and used by Mr. Perez's medical providers with the intent that Francisco C. Perez and his medical providers rely upon such misrepresentations about the safety and efficacy of the SynchroMed® II Device.

58

222. Defendants failed to use reasonable care or competence in obtaining the information or communicating it to Francisco C. Perez and his medical providers.

223. Francisco C. Perez and his medical providers reasonably and justifiably relied upon such representations provided by Defendants that the SynchroMed® II Device was safe for use for the prescribed and intended purposes.

224. Representations and communication by Defendants to Francisco C. Perez and his medical providers were false, and thereby caused Francisco C. Perez's injuries described herein, harming Mr. Perez as a result of the false representations of Defendants.

## COUNT VIII
## VIOLATIONS OF ARIZONA CONSUMER FRAUD ACT
### (A.R.S. § 44-1522)

225. Plaintiff incorporates by references, as if fully set forth herein, each and every allegation contained in the preceding paragraphs of this Complaint.

226. By way of presenting alternative theories, but not limiting available remedies, Plaintiff further alleges Arizona Revised Statutes declares deceptive, unconscionable or unfair acts or practices in the conduct of any trade or commerce to be unlawful. Specifically, A.R.S. § 44-1522 (A) states: "the act, use or employment by any person of any deception, deceptive or unfair act or practice, fraud, false pretense, false promise, misrepresentation, or concealment, suppression or omission of any material fact with intent that others rely on such concealment, suppression or omission, in connection with the sale or advertisement of any merchandise whether or not any person has in fact been misled, deceived or damaged thereby, is declared to be an unlawful practice."

227. Through Defendants' marketing and sales of their SynchroMed® II Device, Defendants have committed acts and practices in trade or commerce which shock the conscience, offend established public policy, and are immoral, unethical, oppressive, unscrupulous, or substantially injurious to consumers, acts and practices which are material and are likely to mislead consumers acting reasonably under the circumstances.

228. The aforementioned conduct of Defendants constitutes unconscionable or unfair acts and practices in trade or commerce in violation of Arizona Revised Statutes.

229.   These acts and practices of Defendants have injured, and continue to injure, and prejudice the public.

230.   Defendants have willfully engaged in the acts and practices alleged herein when Defendants knew or should have known that said acts and practices were unconscionable and unfair.

231.   Unless Defendants are temporarily and permanently enjoined from engaging further in the acts and practices alleged herein, the continued activities of Defendants will result in irreparable injury to the public for which there is no adequate remedy at law.

232.   Plaintiff has suffered a loss as a result of Defendant's violation of Arizona Statutes and the regulations promulgated pursuant to it, and seeks to recover actual damages, attorneys' fees, and court costs under law.

## COUNT IX
## VIOLATIONS OF MINNESOTA UNLAWFUL TRADE PRACTICES ACT
### (Minn. Stat. § 325D.13)

233.   Plaintiff incorporates by reference all paragraphs of this Complaint as if fully set forth herein.

234.   The Unlawful Trade Practices Act states that "[n]o person shall, in connection with the sale of merchandise, knowingly misrepresent, directly or indirectly, the true quality, ingredient or origin of such merchandise."

235.   Plaintiff has standing to bring this action pursuant to Minnesota's private attorney general statute, Minn. Stat. § 8.31, subd. 3a, which reads: "any person injured by a violation of any of the laws referred to in subdivision 1 may bring a civil action and recover damages, together with costs and disbursements, including costs of investigation and reasonable attorney's fees, and receive other equitable relief as determined by the court."

236.   Medtronic represented to the public in general and specifically Plaintiff that the SynchroMed® II Devices implanted in Plaintiff were safe and effective, and manufactured without defects in compliance with federal regulations.

237.    At the time Medtronic made these representations to the public and Plaintiff, Medtronic knew that the FDA had determined that the SynchroMed® II Devices implanted in Plaintiff were "misbranded" and "adulterated" and defectively manufactured in violation of federal law at Medtronic's plants in Minneapolis and Puerto Rico.

238.    Plaintiff is disabled and therefore is entitled to an additional civil penalty of ten thousand dollars ($10,000) for each violation of the Minnesota Consumer Fraud Act. (*See* Minn. Stat. § 325F.71.)

## COUNT X
### VIOLATIONS OF MINNESOTA CONSUMER FRAUD ACT
### (Minn. Stat. § 325F.69)

239.    Plaintiff incorporates by reference all paragraphs of this Complaint as if fully set forth herein.

240.    The Minnesota Consumer Fraud Act prohibits false and misleading statements and false promises made in connection with the sale of any merchandise.

241.    Plaintiff has standing to bring this action pursuant to Minnesota's private attorney general statute, Minn. Stat. § 8.31, subd. 3a which reads: "any person injured by a violation of any of the laws referred to in subdivision 1 may bring a civil action and recover damages, together with costs and disbursements, including costs of investigation and reasonable attorney's fees, and receive other equitable relief as determined by the court."

242.    Defendants are a person as defined by Minn. Stat. § 325F.68, subd.3. 60.

243.    SynchroMed® II Device is merchandise within the meaning of Minn. Stat. § 325F.68, subd. 2. 61.

244.    SynchroMed® II Device is and has been advertised and sold within the meaning of Minn. Stat. § 325F.68, subd. 4. 62.

245.    Defendants are violating and have violated the Minnesota Consumer Fraud Act by representing that the SynchroMed® II is safe for the use in the human body, and failing to disclose that SynchroMed® II Device(s) received by Plaintiff contains

manufacturing defects and has been manufactured in violation of federal regulations and is "misbranded" and "adulterated" within the meaning of federal regulations.

246.    Medtronic communicated the false and misleading statements to the public in general and specifically to Plaintiff, with the intention that Plaintiff would rely on the statements and in connection with the sale of the SynchroMed® II Devices.

247.    As a direct and proximate result of Medtronic's violation, Plaintiff has been damaged in an amount to be proven at trial.

248.    Plaintiff is elderly or disabled and therefore is entitled to an additional civil penalty of ten thousand dollars ($10,000) for each violation of the Minnesota Consumer Fraud Act. (*See* Minn. Stat. § 325F.71.)

## COUNT XI
## VIOLATIONS OF MINNESOTA FALSE ADVERTISING ACT
### (Minn. Stat. § 325F.67)

249.    Plaintiff incorporates by reference all paragraphs of this Complaint as if fully set forth herein.

250.    Plaintiff has standing to bring this action pursuant to Minnesota's private attorney general statute, Minn. Stat. § 8.31, subd. 3a, which reads: "any person injured by a violation of any of the laws referred to in subdivision 1 may bring a civil action and recover damages, together with costs and disbursements, including costs of investigation and reasonable attorney's fees, and receive other equitable relief as determined by the court."

251.    The Minnesota False Advertising Statue prohibits advertisements containing "untrue, deceptive, or misleading" representations "with intent to sell or in anywise dispose of merchandise to increase the consumption thereof, or to induce the public in any manner" Medtronic made representations or about the SynchroMed® II Device that contained untrue, deceptive or misleading representations with the intent to sell or dispose of the Device, in that it represented the device was free from manufacturing defects and manufactured in compliance with federal law. Medtronic failed to disclose to consumers

in general and specifically Plaintiff that the FDA had determined that the SynchroMed® II Device implanted in Plaintiff was "misbranded" and "adulterated."

252.    Medtronic failed to disclose to consumers in general and specifically to Plaintiff that at the time the devices were manufactured, that the FDA had determined and Medtronic admitted that Medtronic's Minneapolis and Puerto Rico manufacturing plants were manufacturing the SynchroMed® II Device in violation of FDA regulations.

253.    Medtronic's representations through its Sales Representatives, brochures, Package Inserts, Internet communications, Opinion Leaders, Patient Nurses, and patient testimonials, about the SynchroMed® II Device to medical providers and the public in general, and specifically to Plaintiff are "advertisements" for the purpose of the Statute.

254.    Medtronic made false representations, and failed to disclose material representations to the public and Plaintiff with the intent to sell the SynchroMed® II Device to Plaintiff and others, thereby causing damages.

255.    Plaintiff is disabled and therefore is entitled to an additional civil penalty of ten thousand dollars ($10,000) for each violation of the Minnesota Consumer Fraud Act. (*See* Minn. Stat. § 325F.71).

**PRAYER FOR RELIEF**
**JURY TRIAL DEMAND**

Plaintiff hereby requests a trial by jury on all claims and issues so triable.

WHEREFORE, Plaintiff demands judgment against Defendants in an amount of damages in excess of seventy-five thousand dollars ($75,000), individually, jointly, severally, and in the alternative, including:

1.    Awarding actual damages to Plaintiff incidental to the purchase and use of the products at issue in an amount to be determined at trial;

2.    Awarding the past costs of treatment for Francisco C. Perez's injuries caused by the products at issue in an amount to be determined at trial;

3.    Awarding damages for Francisco C. Perez's physical pain and suffering in an amount to be determined at trial;

63

4.      Awarding damages for Francisco C. Perez's mental and emotional anguish in an amount to be determined at trial;

5.      Awarding damages to the spouse and statutory beneficiaries for the pecuniary loss of love, affection, consortium, companionship, comfort, and guidance since the death and in the future and loss of past and future support;

6.      Awarding damaged for mental pain and suffering for the spouse and statutory beneficiaries for emotional suffering already experienced and that which is reasonably probable to be experienced in the future, including anguish, sorrow, stress, mental suffering, pain, and shock;

7.      Awarding funeral expenses for Francisco C. Perez;

8.      Awarding the decedent's estate any available damages under law including loss of support and loss of net accumulations reasonably expected but for the death;

9.      Awarding pre-judgment and post-judgment interest to Plaintiff;

10.     Awarding injunctive relief, including disgorgement of all profits made from and monies from and monies paid for the products at issue in an amount to be determined at trial;

11.     Awarding punitive damages;

12.     Awarding the costs and expenses of this litigation incurred by Plaintiff;

13.     Awarding reasonable attorneys' fees and costs as provided by law;

14.     Awarding civil penalties for statutory violations as claimed above; and

15.     Any other further relief in law or equity that this Court deems appropriate, necessary, just, and proper.

RESPECTFULLY submitted this 29th day of August, 2016.

GALLAGHER & KENNEDY

By:  /s/ Paul L. Stoller
Paul L. Stoller, Esq. (AZ Bar #016773)
Lincoln Combs, Esq. (AZ Bar #025080)
2575 E. Camelback Road, Suite 1100
Phoenix, Arizona 85016-9225

1

Gale D. Pearson, Esq. (MN #244673)
**PEARSON, RANDALL, &**

2

**SCHUMACHER, P.A.**
310 Fourth Avenue South, Suite 5010

3

Minneapolis, Minnesota 55415

4

Esther E. Berezofsky, Esq.
Kevin Haverty, Esq.

5

**WILLIAMS CUKER BEREZOFSKY,**
**LLC**

6

210 Lake Drive East
Cherry Hill, New Jersey 08002

7

8

Michelle A. Parfitt, Esq.
**ASHCRAFT & GEREL, LLP**
4900 Seminary Road, Suite 650

9

Alexandria, Virginia 22311

10

*ATTORNEYS FOR PLAINTIFF*

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28